## JONES *v.* THE STATE.

J. kept a house for the daily congregation of a large number of people to make bets on horse-races run in other States. The system was, that the person desiring to bet made application for a bet on a certain horse at the posted odds, handing his application and the money to be bet to J. or his agent; this application was then telegraphed to R. in a foreign State for acceptance or rejection; if the bet was lost, the money was deposited by J. to the credit of R., while if it was won, J. paid the winnings (less 10 cents commission) to the bettor out of funds kept with him for that purpose by R. *Held*, (1) that J. was guilty, under the Penal Code, § 398, of keeping and maintaining a gaming-house; and (2) that, even if the bets were accepted and consummated in another State, the money was hazarded in the house kept by J.

Argued April 23,—Decided May 10, 1904.

Indictment for maintaining gaming-house. Before Judge Roan. Fulton superior court. February 20, 1904.

The indictment charged that Jones "did maintain a gaming-house in which . . money was hazarded with his knowledge and consent on horse-races." The evidence showed that he maintained a house wherein were blackboards on which were posted the names of horses entered in races to be run at New Orleans, with names of jockeys, weights carried, and odds offered; and that persons were allowed to congregate in this house and to offer bets, which offers were there received on tickets by Jones or his agent, on any of such horses. The offers were forwarded by telegraph

to Roots, at New Orleans, for acceptance or rejection, and he would immediately telegraph back an acceptance or rejection of the bet; all of this being before the race was run. If the horse so selected won in the race, the money wagered was paid to the bettor by an agent of Jones, less a commission of ten cents; if such horse did not win, the bettor's money so staked was lost to him, and was deposited by Jones to the credit of Roots, who kept on deposit in Atlanta a sufficient sum, which Jones was authorized to use, to cover any losses incurred by him on bets so accepted. Jones kept up signs in the house, prohibiting betting therein.

After verdict of guilty, Jones moved for a new trial on the ground that the evidence did not support a conviction. The motion was overruled, and he excepted.

*Rucker & Rucker* and *Arnold & Arnold*, for plaintiff in error, cited 89 Va. 878; 89 Mo. 271; 31 N. J. L. 68; 14 Am. & Eng. Enc. L. (2d ed.) 702; Clark, Con. 29, 43; 1 Q. B. Div. (1895) 130.

*C. D. Hill*, solicitor-general, contra, cited 14 Am. & Eng. Enc. L. (2d ed.) 702, 715, 718; 27 Ont. 185; 60 *Ga.* 146; Penal Code, § 398.

SIMMONS, C. J. The facts will be found in the official report. Under these facts we are clearly of the opinion that the court below committed no error in holding the accused guilty. The first proposition announced in the syllabus is fully sustained by the reasoning in the case of *Thrower* v. *State*, 117 *Ga.* 753. The opinion in that case shows what a gaming-house is, and what is necessary to constitute the offense of keeping and maintaining one. Learned counsel for the plaintiff in error did not combat the soundness of the decision in *Thrower's* case, but undertook to show that it did not control the present case, because the indictment in the present case alleged that the money was hazarded in the house, while the evidence showed that, inasmuch as the offer to bet had to be telegraphed to New Orleans and accepted there before it became a bet, there was no hazarding of money in this State, but the hazarding, if any, was in New Orleans. While the authorities generally hold, that, if an offer to bet is made in one State to a person residing in another State, the bet is consummated in the State where accepted and not in the State in which the offer is made, we think that this rule is not applicable under the

statute under which this indictment was found. The decisions cited by counsel for the plaintiff in error are upon statutes, which forbid betting, and under which it is held that an offer to bet made in one State and acceptance by a person in another State is not a violation of the betting laws of the State in which the offer is made. The accused in the present case was not indicted for betting or for keeping a place in which bets were made, but for keeping and maintaining a gaming-house. The distinction between betting and keeping a gaming-house is pointed out in the able opinion of Lamar, J., in *Thrower's* case, supra. The offense of keeping a gaming-house may be committed where a person keeps a house in which people congregate for the purpose of betting, even if the betting done is not itself a violation of law. In this State it is not a penal offense to bet on a horse-race; but if a man keeps a house in which persons congregate for this purpose, he is guilty of maintaining a gaming-house.

Coming to the facts of this particular case as to the hazarding of money, while we think it was unnecessary to make this allegation in the indictment, still, in our opinion, the facts fully sustain it. When a man desired to make a bet, he filled out an application to be telegraphed to Roots in New Orleans, and at the same time handed in the amount of money he wished to risk on the horse selected. This money was received by Jones or one of his agents. So far as appears from the record, the applicant never received any notice, before the race was run, as to whether his bet was accepted or rejected. After the race was over, the result of the race was announced, and another agent of Jones, in the same house, paid the winnings to those who had won. Where the bet was lost, the money which had accompanied the application was deposited by Jones to the credit of Roots. Under this state of facts we think that the money was hazarded in the house in question. The bettor deposited it there, and lost it if he failed to win, or regained it if he did win. The whole transaction as to the money took place in this house. This was the very object for which the house was kept. It was of itself an invitation to the people to go to that place and make their offers to bet, depositing their money with the proprietor of the house. While there is no law in this State to punish the bettors, there is a law for the punishment of the proprietor of such a house in which people can

meet daily to bet on horse-races and hazard their money thereon. The money was not sent to New Orleans. It was placed in the keeping of the accused, and he kept it if the bettor lost, or repaid it, together with the winnings, if the bettor won. It is clear to our minds that the money was hazarded in the house kept by Jones. The fact that Roots had the right to reject or accept an offer to bet makes no difference. The proof shows that he did accept bets from several of the witnesses, or at least that they were paid or not according to the result of the race. It seems to us that the whole system was a mere device or sham to evade the criminal law upon this subject, — an effort to evade based upon a technical definition of the word "betting," and an artificial distinction as to where the bet was consummated. As was once said by Judge Bleckley, "It is something easier for an offender to baffle the dictionary than the Penal Code; for the former is perplexed with verbal niceties and shades of meaning, while the latter grasps in a broad, practical way at the substantial transactions of men."          *Judgment affirmed.     All the Justices concur.*