# CASES

## DECIDED IN THE

# COURT OF APPEALS OF GEORGIA

### AT THE

## MARCH TERM, 1907.

---

### 395.  ANDERSON *v.* THE STATE.

1. Before a reviewing court is authorized to pass upon the constitutionality of an act of the General Assembly, it must appear that the question was made or presented in the court below and was passed upon by the trial judge; also the alleged repugnancy of the statute to some portion of the constitution must be specifically asserted.

   (*a*) An allegation of the repugnancy of a statute to the constitution is not sufficiently specific, unless the clause or paragraph of the constitution claimed to be violated is set out.

   (*b*) No constitutional question is properly presented in this case.

2. An indictment is sufficient which states the offense in the terms or language of the statute, or so plainly that the nature of the offense charged may be easily understood by the jury.

3. By the Penal Code, § 1039, a definite punishment is prescribed for "every crime declared to be a misdemeanor." The effect of this section is not merely confined to the misdemeanors enumerated in the code, but has a prospective force.

4. A place where futures are bought and sold on margins is a gaming-house.

   (*a*) This is true although "the contracts are telegraphed out of the State," if the actual wagering or the settlement of the wagers take place in this State.

   (*b*) The Boykin act (Acts 1906, p. 95) has withdrawn from the business of dealing in futures on margins whatever legislative sanction there was to be implied from the fact that by the tax act of the State a license tax had been imposed upon "bucket shops."

   (*c*) An assertion, although made in each transaction, by the customers of an office where futures are bought and sold, that actual delivery is contemplated and understood in all cases, will not prevent the keeper of the office from being guilty of maintaining a gaming-house, if as a matter of fact the customers, throughout a continued course of dealings, do not make, tender, or accept actual delivery, but, through the proprietor of the office, settle their winnings and losses in money. The actual facts of the case must override the contradictory alleged contemplation of the parties.

1                1

5. Where an indictment contains two counts, and the defendant has been found guilty on both counts, and only one sentence has been imposed, and the evidence authorizes the conviction, errors assigned relating to one count only are immaterial. In this case the evidence authorized the verdict on both counts. The trial having been entirely free from error as to the count in the indictment charging the maintenance of a gaming-house, this court will not pass upon alleged errors in the instructions of the court to the jury in relation to the count charging a violation of the Boykin act, commonly known as the "anti-bucket shop law."

Indictment for keeping gaming-house, from Fulton superior court—Judge Roan. March 2, 1907.

Argued May 2,—Decided May 16, 1907.

*Anderson, Felder, Rountree & Wilson, Rosser & Brandon,* for plaintiff in error.

*C. D. Hill, solicitor-general, T. W. Rucker, R. R. Arnold,* contra.

POWELL, J. This is what is known as the "bucket-shop case," being the first to come to this court from a prosecution under the Boykin act (Ga. Laws, 1906, p. 95). The title of that act is as follows: "An act to prohibit contracts and agreements for the sale and future delivery of cotton, grain, provisions, and other commodities, stocks, bonds, and other securities, upon margin, commonly known as dealing in futures; to declare such transactions unlawful, and to constitute a misdemeanor on the part of any person, association of persons, or corporation participating therein, whether directly or indirectly; to prohibit the establishment, maintenance, or operation of any office or other place where such contracts are made or offered; to define what shall constitute prima facie evidence of guilt; to compel all persons participating in such transactions to testify concerning their connection therewith; to provide that no discovery made by any witness which would tend to subject him to conviction or punishment under this act shall be used against such witness in any penal or criminal proceeding, and that he shall be altogether pardoned therefor; to provide that regular commercial exchanges and other bona fide trade organizations may post quotations of market prices, and for other purposes." Section 1 (page 96) provides that "from and after January 1, 1907, it shall be unlawful for any person, association of persons, or corporation, either as principal or agent, to establish, maintain, or operate an office or other place of business in this State for the purpose of carrying on or engaging in the business, forbidden by

this act, commonly called 'dealing in futures on margins,' and any person violating the provisions of this section shall be guilty of a misdemeanor." In section 2 it is provided that "every contract or agreement, whether or not in writing, whereby any person or corporation shall agree to buy or sell and deliver, or sell with an agreement to deliver, any wheat, cotton, corn, or other commodity, stock, bond, or other security to any other person or corporation when in fact it is not in good faith intended by the parties that an actual delivery of the articles or thing shall be made, is hereby declared to be unlawful, whether made or to be performed wholly within this State or partly within and partly without this State; it being the intent of this act to prohibit any and all contracts or agreements for the purchase or sale and delivery of any commodity or other thing of value on margin, commonly called dealing in futures, when the intention or understanding of the parties is to receive or pay the difference between the agreed price and the market price at the time of settlement: provided, that nothing herein contained shall be construed to apply to transactions by mail or wire between persons in this State and persons outside this State, where the person outside this State is not represented in this State by any broker, agent or attorney in said transaction." Section 3 makes any person who shall become a party to any of such contracts, personally or as agent, directly or indirectly, or who shall do anything to aid or further such an agreement, guilty of a misdemeanor. Section 4 makes participants competent witnesses and provides immunity from punishment for such as are called to testify. Section 5 (page 97) makes proof of certain things prima facie evidence of guilt of a violation of sections 2 and 3. Section 6 is as follows: "Proof that anything of value agreed to be sold and delivered was not actually delivered, and that one of the parties to such agreement deposited or secured, or agreed to deposit or secure, what are commonly known as 'margins,' shall constitute prima facie evidence of a contract declared unlawful by the terms of this act." Section 7 provides that "proof that any person, association of persons, or corporation, either as principal or agent, has established an office or place where are posted or published from information received the fluctuating prices of cotton, grain, provisions, stocks, bonds, or other commodity or thing of value, or either of them, shall constitute prima facie evidence of

guilt of the offense or offenses prohibited in section 1 of this act."
And section 8: "This act shall not be so construed as to prevent or
render unlawful the posting or publishing of market quotations or
·prices of commodities, stocks, bonds, and securities by any regularly
;organized commercial exchange or other bona fide trade organization
.in which no purchase or sale for future delivery on margin is per-
mitted; that no person or corporation committing any of the acts
or things prohibited in defense thereof to plead the payment of any
license or other tax to the State, or to any county or municipality
thereof, nor shall the payment of any license or other tax in any
wise operate to relieve such offender from the penalties imposed.
by this act." Conflicting laws are repealed.

The indictment contained two counts, one under this act and the
other one under the statute prohibiting gaming-houses. The. sub--
stance of the first count is that the defendant,. with others, "in
the county aforesaid, on the 25th day of January, in the year of
our Lord, 1907, with force and arms, did establish, maintain, and
operate an office and place of business for the purpose of carrying
on and engaging in the business commonly called dealing in fu--
tures on margins, and did then and there, in said office and place
of business established for the purpose aforesaid, maintain and op--
erate and engage in a business commonly called 'dealing in futures.
on margin.'" The second count charges that the same persons.
did, "in the county aforesaid, on the day aforesaid, keep and main--
tain a gaming-house." The defendant demurred to the first count.
of the indictment, on the following grounds: " (1) Because the.
first count of said indictment does not state facts sufficient to·
charge the defendants, or either of them, with a crime under the
laws of the State of Georgia. (2) Because it is not averred in
said count that the business which the defendants are alleged to·
have established, maintained, and operated is 'forbidden' by the;
act of the legislature (Acts 1906, p. 95), nor that the business is.
one in which contracts are made for the future delivery of com-
modities, and that actual delivery of such commodities is not con-
templated. (3) Because the allegations of said count are con--
sistent with innocence under the law, and said count does not.
point out the details, nor in what ways or particulars the penal
laws were violated. (4) Because the act of the legislature afore--
said, upon which said count is based, prescribes no penalty or pun-

ishment for a violation of said act." The demurrer was overruled, and exceptions were duly taken.

The material parts of the evidence are as follows:

The first witness for the State had been a clerk in the defendant's office, both prior and subsequent to January 1, 1907. He testified that in the defendant's office stocks, cotton, and other commodities were bought and sold on margins for future delivery. He was with the defendant for over a year, and no actual deliveries were ever made during that period. On January 1, 1907 (the date the Boykin act went into effect), the defendant made a slight change in the name of his firm; and the room in which they had formerly posted market quotations was turned over to the Atlanta Commercial Exchange. A door which had opened between the defendant's office and this quotation room was closed up, and also the opening through a window. In the larger room, after January 1st, was the Atlanta Commercial Exchange; and in there a blackboard was kept, an operator was on duty, and the fluctuations of the market were posted. None but members of the Atlanta Commercial Exchange were admitted to this room. There were some 60 to 80 members. "To become a member you just make an application to the secretary and pay $1 a month dues. If a man wants to buy anything, any cotton or stocks or bonds, or wants to sell, he can get the quotations in the larger room, from the blackboard where they are posted; but he can't make a trade in there. For instance, if he wants to buy 100 bales of March cotton, or sell 100 bales of March cotton, he sees that in the larger room on the blackboard, and then if he wants to make a trade he goes to the next room to Mr. C. N. Anderson's [the defendant's] office, coming out of the corridor of the Prudential Building, stepping about 10 feet into another door. Yes, sir; he would come out into the corridor, and go around about 10 feet into another door, to get in where Mr. Anderson is. In there with Mr. Anderson is Mr. Huffaker, an operator, and a boy and myself when I was employed with them. When he goes into Mr. Anderson's office, if he wants to make a trade, he has first to sign a power of attorney, on a blank furnished. Yes; I have seen a great many men make trades there. I have known only one man to make a trade in that place since the first of January—Mr. M. E. Ewing. First of all a man has to come in and sign up a blank power of attorney. Yes. I have

seen money pass there between Mr. Ewing and Mr. Anderson since
the 1st of January of this year. The money was handed either to
myself or to Mr. Anderson, by Mr. Ewing, to buy stock. I think
it was he was buying. I have seen Mr. Ewing do that a great many
times since the 1st of January. If he wanted to buy, for instance,.
$100 worth of stock, he would pay the money to C. N. Anderson
& Co.—to Mr. C. N. Anderson. It would be placed to Mr. Ew-
ing's credit. If the stock went down, or whatever he bought went
down, he would have to put up additional margin, if he wished to
carry the stock. Yes; I have known him to do that. For instance,.
if he bought any particular stock, expecting it to go up, and it went.
down, I have known him to come in and put up margins to stay in..
Yes, sir; I have seen that done more than once in this county,
since the 1st of January, by Mr. Ewing. If Mr. Ewing won,
then Mr. Anderson paid him the money in his office, which was ad--
joining the blackboard room. Yes, sir; they settled by the figures
of quotation on the blackboard. The money was paid to Mr. Ew-
ing, if he won, by Mr. Anderson, at that place; if he lost, the money
he had already paid was kept by Mr. Anderson and 'forwarded to
whoever the broker was he placed the trade with. His correspond-
ent outside of the State and county was Campbell & Co. That was
the only correspondent he had. I don't know who Campbell & 
Co. was, except they are in Cincinnati. No, sir; I could not swear
there was a Campbell & Co. Yes; if he lost, he paid his loss to
Mr. Anderson in that room. If he wanted to let his trade go,.
Mr. Anderson kept the money; and if he wanted to stay in the mar-
ket, he would have to put up additional margins with Mr. Ander-
son. If the price of a particular stock he had bought went down,.
and he didn't put up a margin, the money he had already put up
was exhausted, and was sent to Cincinnati by Mr. Anderson. If
there was a rise in the price of an article he had bought, and he
wanted to close out, then he got his money from Mr. Anderson in
that building. He would get the difference between what he
bought it at and what he sold at, less the commission. . . .
From the room containing the blackboard I would say you would
have to go about 15 or 16 feet to get where Mr. Anderson sat."

On cross-examination this witness testified: "The business that
C. N. Anderson undertook to do was just acting as agent for peo-
ple, to transmit orders for execution in some other State. As to

my connection with C. N. Anderson & Co., and the duties I performed in connection with that firm, I was clerk, you might say. If any came in, and couldn't write quick enough, and wanted a quick execution, I would assist them in writing it, and they signed all the blanks. I never actually transmitted any of the orders that went through C. N. Anderson & Co. to Cincinnati, except handing them to the operator. In the case of Ewing he came and signed the telegram himself, on a Western Union telegraph blank, and I handed that to the operator, and the operator transmitted it over the wire. Yes; that is true. C. N. Anderson & Co. had no interest in that transaction, except to receive a commission or brokerage from Ewing; that is all. Yes; Ewing paid me and Anderson & Co. the margins to put up for him, and C. N. Anderson & Co. put that up with Campbell & Co. C. N. Anderson, acting as broker for Ewing, when this telegram had been sent in and executed and the trade confirmed, took the margin and sent it on to Campbell & Co. Campbell & Co. were the brokers in Cincinnati. C. N. Anderson & Co. paid Campbell & Co. part of the brokerage they received from Ewing on any other trade that came in. Yes; it is true that, when a telegram was handed to the operator to be forwarded to Campbell & Co., no order was executed, or no statement of execution was handed out to the trader, until Campbell & Co. were heard from. The purpose was, when Ewing filed the telegram with the operator, that wire was sent on to Campbell & Co., and when Campbell & Co. telegraphed back, then C. N. Anderson & Co. took the margin from Ewing and sent it on, and the trade was executed. I can not recall specifically the several trades that Ewing made, or the exact date. I simply know that Mr. Ewing came in and made trades. I am really testifying about the course of business more than anything else. I can't recall any specific trade where he made a profit or loss. I am satisfied Mr. Ewing made some profit, but I do not recall any specific instance. No; I can not recall any other person. I was with L. J. Anderson & Co. from the 31st of January, 1906, and with C. N. Anderson from the 1st of January this year, until about the 13th of January or the 15th of January. . . . I don't know whether it was for actual delivery or not. No; I do not know that there was ever any understanding had with Ewing or any other trader that the goods were not to be actually delivered

when called for. I don't know anything about that. The members of the association were not required, if they wanted to make trades, to make them through C. N. Anderson & Co. at all. I know of some members of the exchange that did not make any trade at all. Mr. Lincoln is one, a grain man here doing business in Atlanta. I can not recall any others just now, but I presume I do know others. It is true that there are a number of the members of the exchange who did not have anything to do with C. N. Anderson & Co., and did not operate in there at the time I was there. The two places of business were entirely distinct. C. N. Anderson & Co. had no control over the operations of the exchange. They were brokers pure and simple, for commission, operating only for a commission on employment. I do not know positively that persons who wanted to trade through C. N. Anderson & Co. took their quotations from the board of the Atlanta Commercial Exchange, but I know a great many of them did. Yes; as a matter of fact I simply know that some members of the exchange traded through C. N. Anderson & Co. Yes; C. N. Anderson & Co. had their own operator. It is true, as a matter of fact, that when a trade was closed with which C. N. Anderson & Co. were connected it was closed with the quotation of prices as given by Campbell & Co., in Cincinnati, or by themselves if they made a limited order. If they made a limited order, it went out at that limit, or the trade closed at that time. Whether there was a profit or not, it was settled according to the limit. Q. But where that was not true, where the operator's margin was exhausted and his trade was closed, or where he ordered it closed at a certain figure, that was all done by quotation from Campbell & Co. straight, wasn't it? You didn't have to go to the board for that, did you? A. I will have to commit myself to answer that question. I will have to commit Anderson to answer that question. Q. You say you can't answer that, then? When you stated on direct examination that Anderson always closed the trade and settled by the quotations on that board, you didn't mean that, did you? A. Well, you ask me a direct question now. They were both on the same wire. They got their quotations over the same wire, and that is the reason why I stated what I did on the direct examination. It is a mere deduction of mine. No; it is not true, as a matter of fact, since I think about it, that Anderson & Co. had to go to that blackboard

to get the quotations at all. Yes; it frequently happened that a trader who wanted to purchase cotton for future delivery would simply have his order telegraphed in to purchase at the prevailing quotations, and that was all done in Cincinnati. A telegram was simply sent in to Campbell & Co. to execute an order the best they could upon the market at the time they got it, according to the market when they got it, when it was sent without a limit to it. Yes; it frequently happened, when a prospective purchaser wanted to buy at a certain figure and the market in the meantime ran up, that Campbell & Co. could not buy at all, and when they ordered the trade closed out upon the market, whatever the market might be, that was done by Campbell & Co. in Cincinnati, and the market telegraphed in, when the trade was wound up or closed. No; that was not done by any inspection of these blackboards at all."

On redirect examination this witness testified: "As to the purpose of having that blackboard in the room where the quotations and fluctuations of the market were posted, it was to furnish quotations to the members. No; a man could not know anything about the market until he went in to that board, unless he could make a guess at it. A member would get his information upon which he made his trade from this blackboard. The information on the blackboard came from Campbell & Co. That information from Campbell & Co. came on the same wire as C. N. Anderson & Co. They were the same line—the same wire; but Anderson's operator did not take those that were put on the board, you know. Yes; it came over that wire. The same quotations that went on that board came over Anderson's wire. There were two operators, one in Anderson's room and one where the blackboard was, and both of them took the same information of the rise or the fall, or fluctuations, of stock, bonds, cotton, etc., from Campbell & Co. of Cincinnati. Mr. Anderson got those commissions. As to the expense of those quotations, telegraphed service, the cost of a wire a day, it didn't cost anything to get those messages, so far as I know. I don't know who paid for them. It cost nothing to my knowledge. I don't know about that. I know prior to the 1st of January it didn't cost, but after the 1st of January I couldn't swear positively whether it cost anything or not. As to how many employees were in those rooms, the two places, there were two where the blackboard was—the operator, and the secretary and

treasurer, who was the doorkeeper. The operator marked the quo-
tations. In the other room were only three, after I left; four when
I was there. The operator was paid $30 a week, and I was paid
$20 a week, and the office boy was paid $3.50 a week. I said that
the last I know of it there were about 75 or 80 members of the ex-
change that paid a dollar a month."

The Mr. Ewing referred to above was also called as a witness.
He testified: "I have bought up there several times since the 1st
of January, 1907, but I could not tell you how many times. We
have got a board of trade up there, you know, something over 100
members, and we put the quotations on the board as they come in,
and we see the quotations, and then send our orders anywhere we
please. When I would go in and get the quotations from the board,
I would go around in the other room, where Mr. Anderson stayed,
to make my trade, when I wanted to go and trade there. I be-
lieve Mr. Danne was staying there, and I gave the money to him.
Yes; I have paid money to Mr. C. N. Anderson—I have no idea
how many times, but 30 or 40 times, I suppose—since the 1st of
January, 1907. When I would go and get the quotations from
the blackboard and wanted to buy a commodity, I would usually
go in and give it to Mr. C. N. Anderson. If the market went up,
I got my money from Anderson; if it went against me, I don't
know where it went. If it went against me, and I wanted to stay
in the market, I would put up more money. When I would put up
more money in order to stay in the market, I would give it to
Mr. Anderson usually. . . . I am a member of the Atlanta
Commercial Exchange. The only good that membership did me
was the information it gave me by seeing quotations on the black-
board. That is the reason I went into it. I wanted to see the
market. We were not required to trade with C. N. Anderson &
Co., not confined to him at all. We could have went anywhere and
traded we wanted to. It is true it was explained to us that if we
wanted to trade with C. N. Anderson, that they could not act in
any other capacity than our agents, and that they would act in that
way, if we paid a commission. We always signed a contract to
that effect to Anderson, that he was to act as our agent. Yes; we
went in there with the understanding that C. N. Anderson & Co.
would not act with reference to dealings in any other way, except
upon employment to be paid a commission for their services. That

was the understanding, and I always signed a contract to that effect—appointed him as my agent. When I put up a margin there I telegraphed through the operator, over the Western Union wire, to the Cincinnati brokers, and they had to telegraph back confirming the trade. Always when I put in an order for a trade I put the money in that way, with the order, and that money was to be forwarded by Mr. Anderson on my behalf, as my agent, when I made the trade through him. I had to put the money in for his protection. He was employed as my agent, to pay it to the people outside the State. I frequently put in orders for a trade and never got it; but I always got my money—no trouble about getting my money back. Yes; I regarded him, through all those transactions, as my representative, my agent, to place offers for me outside the State, for which I paid a compensation. That was the understanding when I began; and when I closed the trade, if there was money coming back to me, I instructed him, as my representative, to get it back and pay it to me. That is all there was of it, and I never had any trouble. He acted mighty nice with me. I took his receipt for the money, and if I didn't get the trade I would go and give him the receipt, and he would give me the money back. I have done that often. Very frequently I would not get a trade at all. Yes; I signed all of these orders that were made and sent over the wire, and they were directed to Campbell & Co., of Cincinnati, and that is the way they were directed. I never got any actual cotton, or stocks, or bonds. I never asked for it. They never offered it to me, and I never did want it. As to whether or not I would buy 100 bales of cotton straight out, I wouldn't have that much money. I could not have paid for 100 bales of cotton. If I bought 100 bales of cotton I would pay $100. I suppose cotton was worth about $45 or $50 a bale. No, sir; I never had any understanding with Campbell & Co. that they would make actual delivery if I required it, because I never expected any actual delivery. No; I had no understanding with them that they would be relieved from delivering cotton if I required it. I never had any contract of that kind at all. I have always understood they would deliver the cotton if I did require it. No; I never saw one of them in my life (referring to Campbell & Co.). The only contract I had was when I wired an order and they confirmed it. That is all; nothing at all said about actual delivery. Nothing

was ever said at all about any stipulation between me and them that if they wanted to deliver the stock I would not be required to take it. I don't reckon they knew a thing about my financial responsibility. I never saw Campbell & Co. I was expecting Mr. Anderson to look after that. I have heard a good deal about Campbell & Co., and I supposed I was dealing with them through Anderson. I never settled, except on the rise or fall of the market. That is the way I settled."

The district superintendent of the Western Union Telegraph Company testified that the telegraph wire above referred to connects the defendant's office with Odell's office in Cincinnati. It is a leased wire, and the rental rate is $25 per mile per annum. It is about 500 miles from Atlanta to Cincinnati.

The manager of the Prudential Building, in which these offices are located, testified that the lease of these rooms stands in the name of Walter Campbell, but by Campbell's instructions the rents are paid by draft on the Odell Stock & Grain Company. This includes both rooms, Anderson's office and the blackboard room. The two rooms rent for $1,000 per year.

Another witness testified: "I am in and out there [referring to defendant's office] two or three times a day. I have bought a little cotton up there by telegraph every day. I would sign a telegram, I think, to Cincinnati. I am not positive where it went, but I gave it to a young man there in the office, and he bought me some cotton in Cincinnati, he said. I got the quotation of the cotton, the basis for my trade, in another office, down this way next to the Neal Bank. I think just two doors between, or may be just one door. There is one door in Mr. Anderson's office, and then I come down this way and go in to the blackboard and look up there, and that is where I get my quotations. When I bought cotton I went in the room where Mr. Anderson was. I don't think I bought but 50 bales of cotton, and paid $1 a bale for what I bought. Cotton is worth now, I suppose, about $50 for the actual stuff. I put up $50, and bought 50 bales. That is the way I bought it, or $25 for 25 bales. I think I bought 50 bales up there. I think I made a little on my transaction. Mr. Anderson gave me a check, I think. Yes; in that building there. I work for the Bell Telephone Company. No; I never asked for the delivery of that cotton. They never offered to deliver the cotton to me. It would

settle on rise and fall of the market, of course—on the fluctua-
tion." On cross-examination the same witness testified: "I was in
there two or three times a day. Mr. Hamilton occupies the ex-
change and seems to be in charge there—a gentleman who sits
at the door, old man Hamilton, I think. He seems to be man-
ager of the place in there. He tells me he is. Yes; unfor-
tunately, I am a member of this exchange. I pay a dol-
lar a month for the privilege of going in and looking at the board.
No; I do not pay anything for the privilege of trading anywhere.
I go in and look on the board and get these quotations, and then
go and trade where I please. Of course, I could trade in New
York or anywhere else I wanted to. I am under no obligations to
trade with Anderson any more than with Curran, or any other
broker or commission merchant in the city of Atlanta; none what-
ever. Mr. Whittlesey is the man who puts the quotations on the
board. No; I do not believe I have ever seen either one of those
gentlemen in Anderson's office. As to these gentlemen, Mr. Hamil-
ton and Mr. Whittlesey, going to their work every morning just like
the clerks in Neal's Bank, they are there; but I don't stay there.
As to whether they go home at night when they close business I
do not know. I could not tell you where they go. I do not re-
member ever to have seen them go to Anderson's office. When I
go to Anderson's office to make a trade, I just write out a telegram.
Yes; I sign my name to it, and I think it goes to Cincinnati, but
I am not positive. The order goes to buy or sell a certain num-
ber of bales of cotton, according to the rules of the exchange. I
saw Mr. Anderson in his office, and I think probably he has a
stenographer and operator that I saw in there. No, sir; I never
saw these people in the exchange office doing anything. I do not
stay there. I have never seen Mr. Anderson and his force doing
anything in the exchange at all. I don't remember now to have
ever seen Mr. Anderson in there. Yes; that is the way I have
understood it, that those two businesses were separately conducted
so far as I can see. No more connection between Anderson and
this exchange than between the Neal Bank and the exchange, so
far as I can see or know. Those quotations are put on a board in
the exchange room. I never saw any board in Anderson's office.
There are no quotations published in Anderson's office, any more
than in the Neal Bank. I never gave Mr. Whittlesey, the operator

in the Commercial Exchange, an order for cotton, stocks, oats, grain, barley, or anything else. As to whether or not I would have seen if anybody else had given him an order while I was there, I don't pay much attention to that. I just pass in and out, you know. No; I never saw anybody give Mr. Hamilton, the secretary, an order, and I never saw anybody pay him any money for stocks or bonds or futures. In that room where the Commercial Exchange is conducted, the only business done is transacted by Mr. Hamilton, the secretary (who sits at the door and admits members and puts out non-members), and the receiving of quotations by Mr. Whittlesey, the operator, and putting them on the blackboard—is all I have seen done there. If anything else was done in there I would have seen it, I suppose. As you go into that room from the hallway the operator sits to your right, as you enter, and Mr. Hamilton sits to the left, close to the door, with a table to his left, and the members of the exchange sit and watch the board, or come in and go out: This is all I have ever seen done in that room—the operator posting the quotations on the board, and Mr. Hamilton, the secretary, admitting the members and keeping out non-members. I don't think I ever traded for anything but a little cotton. I think I gave my orders to Mr. Anderson or the operator. I am not positive which. I don't remember exactly, but I think my telegrams were addressed to Cincinnati, Ohio, to buy a certain number of bales of cotton at a certain price. I fixed the price. Supposing I order 50 bales of cotton, say of May deliveries, say at 9 cents, the price of the order I gave would be fixed at the place of execution in Cincinnati. If I should send a dispatch to buy me 50 bales of cotton at the market quotation, the price would be the quotations at Cincinnati, I would think. I went by the prices on the board in the Commercial Exchange room, but it was confirmed in Cincinnati. I suppose, when I would go in and see the price of cotton, if May delivery was 9.50, and I would send a telegram to Cincinnati, to buy me a certain number of bales, I suppose they would buy it at the market where the concern was that was representing it. I suppose they would buy it at the market they had there, in the State of Ohio. Yes; before my order was executed I would get a return wire from Cincinnati, confirming my trade, telling me they had executed my order in Cincinnati, at 9.50, or 9.45, or whatever the price might

have been. I suppose that is the way it is done. Yes; in this transaction Mr. Curtis Anderson, the broker, was simply my agent executing my order. That is what he said. Of course, he was my agent. I was trading through him. I paid him a commission to represent me. It cost me so much to make the trade. No; I never did go into Mr. Anderson's place of business and telegraph an order to any other place in Georgia for execution; but I always telegraphed my order outside of the State. That is my understanding. The $50 I would put up for 50 bales of cotton, I suppose, was just the margin in the trade, you know. I don't remember that I saw the contract under which I purchased that cotton. They handed me a telegram, I think. They always gave you a contract. No; I have not a copy of one of those contracts. No; I don't know what the intention of Campbell & Co., or anybody else that I bought this cotton from, was. There was no agreement between me and my agent, C. N. Anderson & Co., or between the firm in Cincinnati, that there was not to be a delivery of this cotton; no contract between us at all; no actual agreement about it; nothing that I know of. I bought this amount of cotton, and paid this amount of money, the amount named in the contract, for future delivery, and that was the whole contract; all I know about it. Just buy so many bales of cotton, and pay so much money. I have been told that there were about 100 members of this exchange. That is all I know. I see the members of this exchange in there, when I would go in from time to time. The members of the exchange go in there and look at the quotations, and then go out and send their orders anywhere they please. Yes, sir; there are a great many members of this exchange who are dealing in grain and other commodities, flour men and so on, who go in there; but I couldn't say whether they made trades or not. I would see them in there with other members."

For the defense several gentlemen testified that they were members of the Atlanta Commercial Exchange, and that they themselves had no relation with the defendant. They did not buy or sell futures; but, being in the actual business of dealing in grain, etc., desired the market quotations for business purposes.

The defendant's statement is as follows: "I am a member of the firm of C. N. Anderson & Co., who are general brokers in the city of Atlanta. We consulted attorneys before we ever began

our business, and believed that we were within the law of Georgia,. and we had no intention of violating the laws and would not do· so if we knew it. We are purely brokers; got no interest in these· transactions you have heard about whatsoever, except to receive our commission. We require every customer who places one of these orders to sign a power of attorney, authorizing us to act as their agent, before we place any orders whatsoever. Campbell & Co. are brokers in Cincinnati, and trade on the different exchanges throughout the country, not for themselves, but for their· clients. We have no connection whatever with Campbell & Co. of Cincinnati, not the slightest. The only connection whatsoever we have with them is to get our commission from our customers. We· pay them a part of that commission to handle these orders for our· customers. We pay our rent to Walter Campbell. As to the com-· mercial agency, I don't know anything about their rent. Their· business is entirely separate from mine, and we have no connection with them whatsoever."

Samples of the contracts signed by the defendant's customers. were introduced. They were in the following terms: "I do· hereby constitute and appoint C. N. Anderson & Co. my lawful agents and brokers, with authority to place for me such orders as. I may give them, with such persons and in such markets as they· may select, located outside of the State of Georgia, for the purchase or sale of bonds, stocks, cotton, grain, and other produce, either for present or future delivery, and I agree to pay them the· usual and customary commission allowed by brokers for like serv-· ices, for all such services rendered to me by them; and, in cases: of orders for future delivery, I agree to furnish them with the· usual and customary margins required, to be placed for my account with those to whom said orders are given, provided that the said agents and brokers shall not be bound to place any orders given to them by me, unless they so desire."

The defendant also introduced samples of the statements sent. by Campbell & Co. to Anderson & Co., showing daily transactions. These statements contained, at the head thereof, the following language: "Below we submit a statement of business transacted for your account as ordered. On all marginal business ·the right is reserved to close transactions when margins are running out,. without giving further notice; we being governed in this by the·

market quotations as received at our office. We solicit and receive no business, except with the understanding that the actual delivery of the property bought or sold upon orders in all cases is contemplated and understood. All unfilled orders expire with the day, unless ordered open."

Defendant also put in evidence the articles of association of the Atlanta Commercial Exchange, in substance as follows: "The undersigned do, by subscribing this agreement, hereby associate ourselves together in good faith, as a trade organization or association, for the purposes hereinafter stated, agreeing among ourselves to do and perform the matters and things hereinafter set out; and we consent and agree that any person or persons who may hereafter duly sign this agreement, or any correct copy thereof, shall become a member of the organization, or association. The purpose of this association or organization is to establish a place and conduct an office, or offices, for the posting and publishing of market quotations or prices of commodities, stocks, bonds, and securities, upon blackboards or otherwise, for the mutual benefit and advantage of the members of the association. It is agreed and distinctly understood that the organization or association shall neither directly nor indirectly purchase or sell, for future delivery on margin, any of the articles or things the market prices of which are quoted and published thereby; nor shall it, directly or indirectly, permit any person, or persons, or corporation, to use its offices, or in connection with the association, in the purchase or sale, for future delivery on margin, of any such articles or things. The publication in its offices of market quotations, or prices, as aforesaid, is to be strictly for the advantage and benefit of the members of the association or organization, and each of them, in the conduct of their private affairs, and in conformity with the act of the General Assembly of Georgia, relative to dealing in 'futures,' approved August 20, 1906. It is agreed and understood that, so soon as practicable, the association or the members thereof shall be duly incorporated under the laws of Georgia, under the name and style of 'Atlanta Commercial Exchange,' or such other name or style as may hereafter be agreed upon. It is further agreed and understood that a president, or other executive of the association, shall be forthwith elected, as also a secretary and treasurer, who shall hold their position, with

2

such duties attached thereto as are usual in connection with such offices, until the association shall be duly incorporated, organized, and regular officers elected. Such president or executive head to receive a monthly salary of —— dollars, and such secretary and treasurer to receive a monthly salary of —— dollars. It is agreed that the president or executive head may employ an operator, rent offices, and equip the same, and undertake any other expense, within reason, as he may deem necessary to the proper operation of the offices and the conduct of the business of the association, until the due incorporation thereof. Our attorneys, Messrs. Anderson & Anderson, of Atlanta, Georgia, are herewith authorized forthwith to proceed to incorporate said association, in accordance with the spirit of this agreement, and to prepare by-laws for its operation, and submit the same to the incorporators upon the organization of the company. This the 28th day of December, 1906." Signed by C. N. Anderson and about 75 others.

1. Since it is the duty of this court to certify to the Supreme Court, for instructions, any question as to the constitutionality of the statute under which the defendant was indicted, if such a question is properly made and is necessary to the determination of the case by this court, we have first investigated the record with the view of ascertaining whether any such questions are so made. We find the following assignments of error in which apparent attempts to attack the constitutionality of the Boykin act, or portions thereof, are made. In the bill of exceptions, in assigning error upon the exceptions pendente lite, the following ground is set forth: "That the court erred (and the verdict of the jury was void) for that said act of the legislature of Georgia, known as the 'Boykin Act,' is absolutely void, in that it contravenes the constitution of the State of Georgia, because it is a special act prescribing a rule of law where there are general provisions of law covering the case, and because said act violates the constitution of the United States, in that it denies to persons falling under the operation of the law the equal protection of the laws; and because said act, as a whole, opposes and nullifies the fundamental rule of law in American criminal jurisprudence, that a person charged with crime is presumed to be innocent until proven guilty by the prosecuting power beyond a reasonable doubt." This fails to raise a constitutional question, for two reasons: Reviewing courts will

not pass upon the constitutionality of an act of the General Assembly, unless it appears that the question was made or presented in the court below and was passed upon by the trial judge; nor unless it clearly appears from the record what clause or paragraph of the constitution it is claimed that the statute violates. *S., F. & W. Ry. Co.* v. *Hardin,* 110 *Ga.* 433, 437, 35 S. E. 681; *Jones* v. *Oemler,* 110 *Ga.* 209, 35 S. E. 375; *Brown* v. *State,* 114 *Ga.* 60, 39 S. E. 873; *Newkirk* v. *So. Ry. Co.,* 120 *Ga.* 1048, 48 S. E. 426; *Slate* v. *Henderson,* 120 *Ga.* 781, 48 S. E. 334 (7); *Henderson* v. *State,* 123 *Ga.* 466, 51 S. E. 385; *Moore* v. *Houston County,* 124 *Ga.* 898, 53 S. E. 506; *Prey* v. *Oemler,* 120 *Ga.* 224, 47 S. E. 546 (2); *Laffitte* v. *Burke,* 113 *Ga.* 1000, 39 S. E. 433. See, also, *Vanderford* v. *Brand,* 126 *Ga.* 72, 54 S. E. 822; *Sowell* v. *State,* 126 *Ga.* 108, 54 S. E. 916; *Seale* v. *State,* 126 *Ga.* 648, 55 S. E. 472.

In one of the grounds of the motion for a new trial error is assigned upon the court's having instructed the jury, in the language of the Boykin act, that "wherever it is proven that any person, association of persons, or corporation has, either as principal or agent, an established office or place where are posted or published, from information received, the fluctuating prices of cotton, grain, provisions, stocks, bonds, or other commodity or thing of value, or either of them, this shall constitute prima facie evidence of guilt of the offense prohibited in section one of this act," and as ground of error it is set out that "the portion of the charge complained of was also error, because the section of the Boykin act which provides that proving that one has an office, or place of business, where there are posted the fluctuating prices of the market, constitutes prima facie guilt of maintaining or operating an office or other place of business for the purpose of carrying on and engaging in the business commonly called 'dealing in futures on margins,' is void. It violates the fundamental principle which has come down to us from our forefathers, and which applies to all criminal cases, that one charged with crime should be presumed to be innocent until proved guilty beyond a reasonable doubt. The provision of the act referred to absolutely makes the doing of a thing, not only innocent under the act, but distinctly permitted by the act, an evidence of the commission of a crime; that is to say, it makes the proof of an innocent thing prima facie

evidence of the commission of a thing entirely distinct and separate which is made penal. Said provision of the Boykin act is also void because it is a special act prescribing a rule of law where there are general provisions of law covering the case. It makes a particular rule of evidence, and raises a particular presumption as to a certain offense made penal, whereas there are general provisions of law (1) to the effect that in all criminal cases the defendant must be proved guilty beyond a reasonable doubt; (2) that in all criminal prosecutions which rest upon circumstantial evidence the circumstances must be sufficient to exclude every hypothesis other than guilt; otherwise, there can be no conviction. The provision of the Boykin act above referred to, therefore, violates the constitution of the State, that any special legislative enactment, where there is a general law applicable, is void." Although presented to the trial court, this assignment fails to properly present the constitutional question, since no clause or paragraph of the constitution is specified therein. We may be pardoned for saying, obiter, that, if these questions had been properly presented, the constitutional objections could hardly have been regarded as meritorious, in the light of the decisions of the Supreme Court in *Banks* v. *State,* 124 *Ga.* 15, 52 S. E. 74, 2 L. R. A. (N. S.) 1007, and *Loeb* v. *State,* 75 *Ga.* 263, and of this court in *Mulkey* v. *State,* 1 *Ga. App.* 521, 57 S. E. 1022.

2. In regard to the point raised by demurrer, as to the first count of the indictment, that it does not negative the idea that in the business alleged to have been carried on by the defendant the actual delivery of commodities was contemplated, it will be noted that the title of the act does not incorporate this exception, and, if this exception exists at all, the act has nevertheless declared in general terms the dealing in futures on margins to be unlawful. The spirit of the following cases so clearly confutes this point that a citation of them seems sufficient: *Williams* v. *State,* 89 *Ga.* 483, 15 S. E. 552; *Rumph* v. *State,* 119 *Ga.* 121, 45 S. E. 1002; *Herring* v. *State,* 114 *Ga.* 96, 39 S. E. 866; *Kitchens* v. *State,* 116 *Ga.* 847, 43 S. E. 256; *Tigner* v. *State,* 119 *Ga.* 114, 45 S. E. 1001; *Sowell* v. *State,* 126 *Ga.* 105, 54 S. E. 916 (2); *Kemp* v. *State,* 120 *Ga.* 158, 47 S. E. 548 (4); *Seale* v. *State,* 121 *Ga.* 745, 49 S. E. 740; *Oglesby* v. *State,* 121 *Ga.* 602, 49 S. E. 706. The first section of the act, in general terms,

makes criminal the maintenance of an office or place of business for the carrying on of the business commonly called "dealing in futures on margins;" and the words, "forbidden by this act," are merely in the nature of an epithet, and do not limit the generality of the section. The second section of the act is a legislative amplification of the definition of the words, "commonly called dealing in futures," but does not have the effect of taking from them anything adhering in their ordinary meaning. Not only is it unlawful to do those things commonly called "dealing in futures," as the words in their ordinary acceptation mean, but also to do any of the other things mentioned in the second section of the act, if they are not already included in the ordinary meaning of the words "dealing in futures." An indictment is sufficient which states the offense in the terms and language of the statute, or so plainly that the nature of the offense charged may be easily understood by the jury. Penal Code, §929.

3. The contention in the demurrer that the act prescribes no penalty is altogether without merit. A violation of its provisions is declared to be a misdemeanor; and by the Penal Code, §1039, a definite punishment for "every crime declared to be a misdemeanor" is prescribed.

4. Error is assigned upon the following charge of the court: "If the defendant conducted an establishment where transactions of the kind just described were permitted (that is, dealing in futures on margins, contrary to the Boykin act), allowed, and encouraged, to the defendant's knowledge, and with his participation therein, or, that is, if persons came together and bought or sold commodities, with an agreement for future delivery, when it was not in good faith intended to deliver the commodities, and when the undertaking of the parties is to receive or pay the difference between the agreed price and the market price at the time of settlement, then the defendant, if that is established beyond a reasonable doubt from the evidence in this case, would be guilty of maintaining a gaming-house, as defined in the second count of this indictment." This raises the distinct question whether one who operates an office where "futures" are bought and sold is guilty of the offense of keeping a gaming-house. We do not think that at common law such an office would have been a gaming-house. We also recognize the distinction between the mean-

ing of the words "betting," "wagering," "gaming," and "gambling." Yet we are constrained to hold that by judicial evolution and legislative enactment the common-law offense of keeping a gaming-house has been so broadened in its scope as to include any place wherein persons are allowed to assemble for the purpose of betting, wagering, gaming, or gambling, and especially where such practices are encouraged by the proprietor. We can not give full credit to the spirit of the cases of *Thrower* v. *State,* 117 *Ga.* 753, 45 S. E. 126, and *Jones* v. *State,* 120 *Ga.* 186, 47 S. E. 561, without reaching this conclusion. It may be that in the cases just cited the Supreme Court gave to the meaning of the word "gaming-house" an unwarranted extension (we do not say they did, or did not), and it may be that a strained distinction may be drawn between the business under consideration in this case and that denounced in those cases; but if we give those cases full faith as precedents, as not only propriety, but also the constitution itself, requires us to do, we are obliged to hold that a gaming-house is no longer to be regarded as a place prohibited, as at common law, because the spirit of amusement found there entices laborers and apprentices from their wonted toil, but as a place which it is criminal to keep because persons congregate there to wager or to hazard money or other things of value, whatever be the device whereby it is accomplished, whether by games of amusement or otherwise. However, it may be noted that by English statute antedating our adoption of the laws of the mother country it was contemplated that the word "gaming-house" should have a progressive meaning. By St. 33 Hen. VIII, c. 9, §11, it is enacted that "no manner of person or persons, of what degree, quality, or condition soever he or they be, from the feast of the nativity of St. John the Baptist now next coming, by himself, factor, deputy, servant, or other person, shall for his or their gain, lucre, or living, keep, have, hold, occupy, exercise, or maintain any common-house, alley, or place of bowling, coyting, cloysh-cayles, half-bowl, tennis, dicing-table, or carding, or any other manner of game prohibited by any estatute heretofore made, or any unlawful new game now invented or made, or any other .new unlawful game, hereafter to be invented, found, had or made, upon pain to forfeit and pay for every day keeping, having or maintaining, or suffering any such game to be had, kept, executed, played, or maintained within any such

house, garden, alley, or other place, contrary to the form and effect of this estatute, forty shillings." 1 Hawkins' Pleas of the Crown (8th ed.) 721. In the case of Rex *v.* Howell (K. B. 1672) 3 Keble, 510, "the defendant being convicted of keeping a common cock-pit six days, the court conceived it an unlawful game and took their measure by 23 Hen. VIII, of 40s. a day, though the indictment were at common law."

As to whether buying and selling cotton futures is within this category of gaming, wagering, and gambling, we quote from the opinion in *Cunningham* v. *National Bank,* 71 *Ga.* 403, 51 Am. Rep. 266: "But what is the transaction termed 'futures?' It is this: One person says that I will sell you cotton at a certain time in the future for a certain price. You agree to pay that price, knowing that the person you deal with has no cotton to deliver at the time, but with the understanding that when the time arrives for delivery you are to pay him the difference between the market value of that cotton and the price you agreed to pay if cotton declines, and if cotton advances he is to pay you the difference between what you promised to give and the advanced market price. If this is not a speculation on chances, a wagering and betting between the parties, then we are unable to understand the transaction. A betting on a game of faro, brag, or poker can not be more hazardous, dangerous, or uncertain. Indeed, it may be said that these animals are tame, gentle, and submissive, compared to this monster. The law has caged them and driven them to their dens. They have been outlawed, while this ferocious beast has been allowed to stalk about in open mid-day, with gilded signs and flaming advertisements, to lure the unhappy victim to its embrace of death and destruction. What are some of the consequences of these speculations on 'futures?' The faithful chroniclers of the day have informed us, as growing directly out of these nefarious practices, that there have been bankruptcies, defalcations of public officers, embezzlements, forgeries, larcenies, and death. Certainly no one will contend for one moment that a transaction fraught with such evil consequences is not immoral, illegal, and contrary to public policy. In the case of Rudolf *v.* Winters, 7 Neb. 126, the Supreme Court of that State held 'that a contract to operate in grain options, to be adjusted according to the difference in the market value thereof, is a contract for a gambling transaction which the law

will not tolerate. It is contra bonos mores, and against public policy.' We recognize this ruling to be sound, and we adopt the same. This was also ruled by the Supreme Court of Illinois. Pickering *v.* Cease, 79 Ill. 328. Likewise in Wisconsin. Exeringham *v.* Meighan, 55 Wis. 354, 13 N. W. 269; Barnard *v.* Backhaus, 52 Wis. 593, 6 N. W. 252, 9 N. W. 595; Lyon *v.* Culbertson, 83 Ill. 33, 25 Am. Rep. 349; Gregory *v.* Wattowa, 58 Iowa, 713, 12 N. W. 726; Hawley *v.* Bibb, 69 Ala. 52; Rumsey *v.* Berry, 65 Me. 574; Yerkes *v.* Salomon, 11 Hun (N. Y.), 473; Story *v.* Salomon, 71 N. Y. 420; Peabody *v.* Speyers, 56 N. Y. 230; Knapp *v.* St. Louis, K. C. & N. Ry. Co., 6 Mo. App. 206; Gregory *v.* Wendell, 39 Mich. 337, 33 Am. Rep. 390, s. c. 40 Mich. 432; Sampson *v.* Shaw, 101 Mass. 145, 3 Am. Rep. 327; Clarke *v.* Foss, 7 Biss. 540, Fed. Cas. No. 2852; In re Green, 7 Biss. 338, Fed. Cas. No. 5751; Beveridge *v.* Hewitt, 8 Ill. App. 467; 5 Moore, 571; *Thompson* v. *Cummings, 68 Ga.* 124; *Porter* v. *Massengale, 68 Ga.* 296."

The same decision also quotes approvingly from Brua's Appeal, 55 Pa. 298, as follows: "Anything which induces men to risk their money or property, without any other hope for return than to get for nothing any given amount from another, is gambling, and demoralizing to the community, no matter by what name it may be called."

It is insisted, however, that since the current tax act (Acts 1905, p. 28) levies a tax of $1,000 upon all persons engaged in the business of buying or selling futures, such legislative sanction has been given to this business as to prevent the maintenance of an office for that purpose from being a gaming-house. It is true that it was held in *Miller* v. *Shropshire, 124 Ga.* 829, 53 S. E. 335, that, "irrespective of whether a purely speculative transaction in cotton is a 'gaming' contract, within the meaning of Civil Code, §3671, inasmuch as the General Assembly permits one paying a license tax to engage in the business of buying and selling 'futures,' he can not be subjected to the penalty imposed by that section, which declares that 'money or property delivered up upon' a gaming consideration 'may be recovered back from the winner by the loser, if he shall sue for the same in six months after the loss,' or, if he shall fail to bring suit within that period, 'by any person, at any time within four years [thereafter], for the joint use of himself and the educational fund of the county.'"

However, by the Boykin act all legislative sanction is expressly withdrawn from such transactions. See *Odell* v. *Atlanta,* 97 *Ga.* 670, 25 S. E. 173. The Boykin act, being the latest expression of the legislative mind, controls; and it pro tanto repeals so much of the tax act as previously had the effect of sanctioning, for any purpose, dealing in futures.

The point is also made that this charge is entirely unjustified by the evidence; and it is contended that the evidence shows, without conflict, that Anderson was a broker, pure and simple, who acted only for parties in the State of Georgia, upon their employment, as their agent, for a commission paid by them; that he dealt only with parties outside the State in executing orders for future delivery; and that in all cases the parties outside of the State and C. N. Anderson contemplated actual delivery. A very similar contention was disposed of in *Jones* v. *State,* supra. As was said there: "When a man desired to make a bet, he filled out an application to be telegraphed to Roots in New Orleans, and at the same time handed in the amount of money he wished to risk on the horse selected. This money was received by Jones, or one of his agents. So far as appears from the record, the applicant never received any notice, before the race was run, as to whether his bet was accepted or rejected. After the race was over, the result of the race was announced, and another agent of Jones, in the same house, paid the winnings to those who had won. Where the bet was lost, the money which had accompanied the application was deposited by Jones to the credit of Roots. Under this state of facts we think that the money was hazarded in the house in question. The bettor deposited it there, and lost it if he failed to win, or regained it if he did win. The whole transaction as to the money took place in this house. This was the very object for which the house was kept. It was of itself an invitation to the people to go to that place and make their offers to bet, depositing their money with the proprietor of the house. While there is no law in this State to punish the bettors, there is a law for the punishment of the proprietor of such a house in which people can meet daily to bet on horse races and hazard their money thereon. The money was not sent to New Orleans. It was placed in the keeping of the accused, and he kept it if the bettor lost, or repaid it, together with the winnings, if the bettor won. It is clear to our

minds that the money was hazarded in the house kept by Jones. The fact that Roots had the right to accept or reject an offer to bet makes no difference. The proof shows that he did accept bets from several of the witnesses, or at least that they were paid or not according to the result of the race. It seems to us that the whole system was a mere device or sham to evade the criminal law upon this subject—an effort to evade, based upon a technical definition of the word 'betting,' and an artificial distinction as to where the bet was consummated.. As was once said by Judge Bleckley: 'It is something easier for an offender to baffle the dictionary than the Penal Code; for the former is perplexed with verbal niceties and shades of meaning, while the latter grasps in a broad, practical way at the substantial transactions of men.'" The facts of this case are so very similar to those of the *Jones* case as to make further comment unnecessary.

We are not unmindful of the fact that in the case at bar the defendant furnished to his customer a statement of business on which were printed the words: "Actual delivery of property bought or sold upon orders in all cases is contemplated and understood." But we are not forgetful of the fact that in all the transactions of the defendant's office no actual delivery ever took place. If actual delivery was "contemplated," its inchoate entity never developed into tangibility. If it was "understood," the temptation to ridicule becomes irresistible. One of the definitions of the word "understand" is "to supply mentally as in explanation of an ellipsis," and the course of dealings which took place through defendant's office will not authorize a wider meaning, for from the evidence there was an entire ellipsis of actual deliveries. Such devices rarely fool intelligent judges or juries. Only the very simple would be deceived into believing that a house of assignation was a respectable hotel because there might happen to be a notice posted at the door stating that "Ladies accompanied by gentlemen other than their lawful husbands will not be furnished accommodations here."

5. We have set out at great length, we fear unduly so, the evidence in this case. But we think that through this full statement of the facts as shown on the trial any impartial mind will be able to discover that a device, elaborate in detail, was planned for the evasion of the law, but that, despite it all, the defendant failed to

conceal plain and unmistakable evidences of his guilt. We have no hesitancy in saying that the evidence authorized the verdict under both counts; but, since it will be unnecessary for us to pass upon errors in instructions given or refused as to matters relating only to the first count, if the conviction can be upheld under the second count (for only one sentence was imposed), we may rest our judgment upon the sufficiency of the evidence as to the conviction on that count alone. In this view of the case, errors, if any were committed, which relate only to the first count are immaterial, and therefore would not authorize a reversal. Having held that one who keeps an office for the purpose of affording an opportunity to persons to buy and sell futures on margins can be convicted of keeping a gaming-house, irrespective of whether the contracts are telegraphed out of the State or not, we have no difficulty in sustaining the conviction. It is not necessary that we should pass upon the question whether it is essential that the wagering intent —the intent to speculate, without bona fide contemplation of actual delivery—should be present in the minds of both the contracting parties before the transaction is unlawful; for in every trade which took place through the defendant's office, so far as the evidence discloses, and, therefore, so far as the legality of this conviction is concerned, it is conclusively shown that no actual deliveries were had, and that no such intention bona fide existed in the mind of either party. When one of the defendant's customers lost, the other party to the contract did not require delivery. He took the money deposited with the defendant. When the customer won, this undisclosed counter party did not tender delivery; but Anderson at once paid over to the customer the amount of his winnings. In such a course of dealings the irresistible inference is that both parties acted upon the contract as a purely wagering transaction, and that the defendant was the mere go-between, the mutual agent of both parties. If two gentlemen had met in the defendant's office, and had called for cards and poker chips, and the defendant had furnished them, charging so much for the chips, being stakeholder as it were, and at the end of the game had cashed these chips, would he be heard to assert, in defense to an indictment for keeping a gaming-house, that one of the gentlemen did not intend to play for money, that he was merely playing for amusement, that in fact, at the very time of paying for his chips, he signed

a written statement that it was always contemplated and understood that the playing was for amusement only, and not for money or other thing of value? No matter how solemnly either one or both of these gentlemen who played at this game of futures may have asserted that actual delivery was contemplated and understood, as matter of fact they did not play that way. The record discloses the identity of some of the gentlemen who played on one side of this fascinating game, but it is silent as to who was the counter party or parties. Be that as it may, it is very clear that this undisclosed player had a representative present in the transaction, who took care of his winnings and who paid his losses— the defendant. He may not have known the defendant, and the defendant may not have known him; but one may be an agent for an unknown and unseen principal.

These outlawed occupations often attempt to conceal their true inwardness by devious ways and indirect dealings; but the law looks only to the real substance of the transaction. Think of the shrewd device by which, on January 1, 1907, when the Boykin act went into effect, the door between the two rooms formerly used en suite by the defendant was closed and nailed up, and the room, in which continued those acts denounced by the statute as evidences of guilt, was transferred to the apparently complete custody of the Atlanta Commercial Exchange, an organization containing in its membership several excellent gentlemen who needed market quotations for absolutely legitimate purposes, as well as several others who had no such legitimate uses for them; e. g. telephone employees who bought and sold cotton. But who paid for the maintenance of this room where the fluctuating market was represented on the blackboard? Will it be contended that the office rent, the wages of the employes, and the annual rental, of approximately $12,500, for the leased wire to Cincinnati, were paid out of the modest sum of $1 per-month contributed by each of the 100 members of this exchange? Is there not some significance in the fact that a telegraph instrument in the defendant's office ticked simultaneously with the other on the same wire in the quotation room, and that the Odell Stock & Grain Company paid the drafts for the rent of both the rooms; that the Odell Company paid the rent, though the lease stood in the name of Campbell, and that to Campbell the defendant's customers telegraphed; and that from Campbell came

the statements in return, and that this telegraph wire had one terminus in Odell's office in Cincinnati and the other in this quotation room, touching the defendant's office en passant? Such a tangled web to be so innocent! Perhaps the jury may have conceived the idea that the defendant and Campbell were merely the Odell Company's agents; that this same Odell Company was the undisclosed principal, whose losses the defendant paid, whose winnings he collected. If they did, we shall not say that they have thereby outraged logic.

We find the trial free from material error, and the verdict well supported by the evidence.  *Judgment affirmed.*