LEMONIUS & CO. *v.* D. MAYER & SON ET AL.

1. CONTRACTS. *"Futures."* *Act of* 1882. *Comity.*

Section 2 of the act of 1882 (Laws, p. 140), providing that "no money advanced for the purchase of 'futures,' nor any agreement for the payment of any sum for such purposes, shall be enforced in any court in this state," prohibits the enforcement in this state of such contracts made while the statute was in force, although valid and enforcible in another state or country where made.

2. CONSTRUCTION OF STATUTES. *Surplusage.* *Giving effect to all parts.*

Although words of a statute may be treated as surplusage, if that be necessary to uphold the manifest purpose of the legislature, the general rule of construction is to so construe the statute as to give some effect to all its parts. *Ellis* v. *Murray*, 28 Miss., 129.

3. FUTURE CONTRACTS. *Action thereon.* *Act* 1882 *construed.*

The fact that the title and also § 1 of said act of 1882, expressly refer only to future contracts in this state, does not require the courts to similarly limit § 2, which is applicable to all such contracts wherever made. Its language is plain and unambiguous, and nothing in the statute, or the rule of construction which looks to the old law, the mischief and the remedy, requires a departure from the fundamental maxim of construction that gives to the language of a statute its natural and well-understood meaning.

4. SAME. *Repeal.* *Existing defense.* *Code* 1892, § 4.

Contracts growing out of the purchase or sale of futures, made while said act of 1882 was in force, cannot now be enforced in this state, notwithstanding the repeal of said act by the code of 1892, since § 4 of the code expressly saves existing rights and defenses.

FROM the chancery court of Issaquena county.

HON. W. R. TRIGG, Chancellor.

The facts are stated in the opinion.

*Campbell & Starling,* for appellant.

A contract valid in the jurisdiction where made and to be performed, will be enforced by the courts of another jurisdiction, through comity, although by its laws the contract be void. The exception is where the foreign contract was made with the design to defraud the laws of the forum, or is one which is contrary to sound morals or prejudicial to the interests of the country or state where sought to be enforced. It may be difficult to state exactly when a case comes within the exception. It is safe to say that a contract which is merely *malum prohibitum* in the jurisdiction where sought to be enforced, will be enforced here. To bring a contract within the exception, it must be inherently vicious. This rule has been applied to contracts growing out of the sale of liquors. Wharton on Conflict of Laws, § 486; 33 Mich., 275; 50 N. H., 253. And by our court to a contract of Louisiana made on Sunday. *McKee v. Jones,* 67 Miss., 405. In Massachusetts it was applied to a contract regarding the purchase of slaves, valid where made, though void in that state. 19 Pick., 215; 6 Mass., 358. For the same principle applied to contracts in regard to lottery tickets, see 6 Hill (N. Y.), 526; 3 Met., 207; 10 Vt., 482; 11 N. Y., 437; 46 Mo., App., 323. See, also, 8 Am. & Eng. Enc. L., 1020; 37 Fed. R., 852; 80 N. C., 294; 1 Ph. Eng. Ch., 147; 50 Mich., 388.

*Miller, Smith & Hirsh,* for appellees.

The contract sought to be enforced is plainly within the prohibition of the act of 1882, and a suit in this state to enforce it is forbidden by § 2 thereof. The language of this section is too plain to admit of controversy. The statute was passed to correct an existing and growing evil, and must be construed with reference to the exigency which called it

forth. *Shelton* v. *Baldwin*, 26 Miss., 439 ; *Ingraham* v. *Speed*, 30 *Ib.*, 410; *Kimball* v. *Alcorn*, 45 *Ib.*, 151.

That there was something intrinsically wrong in the evil sought to be remedied may readily be perceived, and the producers of cotton are opposed to it, and are now seeking to procure relief in congress. Looking at all this, it is manifest that the policy and purpose of the statute was to effectually prohibit the enforcement in this state of all future contracts. It is true the first section in the statute made it a criminal offense for any person *in the state* to deal in contracts commonly called "futures," but as our courts could have no criminal jurisdiction over offenses committed elsewhere, it was not necessary to have inserted the limitation as to place. But the legislature had the power to prevent the enforcement of such contracts wherever made, and § 2 therefore omits the limitation. Surely the mere residence of parties cannot determine whether a gaming transaction under our laws shall be enforced. The only way in which the legislature could reach parties and contracts outside of the state was by depriving them of any right of recovery here.

Apart from the plain provision of said statute, our courts are not bound by comity to enforce contracts, although valid where made, which are violative of state laws or which contravene its policy or offend the morals of its people. *Hines* v. *Brazealle*, 2 How. (Miss.), 837 ; *Mahorner* v. *Hooe*, 9 Smed. & M., 247 ; *Wells* v. *Mitchell*, 39 Miss., 800 ; *Ivey* v. *Lalland*, 42 *Ib.*, 444.

It cannot be disputed that a wagering contract contravenes the policy of this state, violates its laws, offends the morals of its people and exhibits an example pernicious and disreputable. See 55 Pa. St., 294; 72 *Ib.*, 155; 71 Ga , 400; 150 Mass., 1 ; 56 Ark., 300; 65 Me., 570; 38 N. J. Eq., 219, s.c. 48 Am. R., 308.

Gambling contracts are not, like Sunday contracts, merely *malum prohibitum*. It is not because Christianity devotes the day to worship, that the law requires it to be observed as a

day of rest. The law views Sunday as a mere civil institution, and does not condemn Sunday contracts as being essentially immoral or degrading. See *Telegraph Co.* v. *McLaurin,* 70 Miss., 26.

COOPER, J., delivered the opinion of the court.

In the summer of 1891, Oscar E. Mayer, of the firm of D. Mayer & Son, was in Liverpool, England, at which place the appellants were in business as cotton commission merchants, and, as such, had before that time, and since have, transacted business with said firm of D. Mayer & Son. At some time prior to the third day of September, Oscar E. Mayer, acting for his firm, directed appellants to purchase for account of his firm a large quantity of cotton for future delivery, which contracts of purchase were to be made on the flags at Liverpool, and under and subject to the rules and usages of the exchange of that city. On the third day of September, the first purchase of two hundred bales was made, and this was followed by other purchases, until, on the seventeenth day of September, contracts for a quantity of cotton aggregating seventeen hundred bales had been made. On the eighteenth day of September, Mayer, being then about to return to America and to this state, of which he was a resident, and in which his firm was engaged in business, gave to appellants a letter confirming their action in the following terms:

"LIVERPOOL, September 18, 1891.
*"Messrs. Lemonius & Co., Liverpool:*

"DEAR SIR—On my leaving homewards, and as a record in business, I confirm the purchases you have made according to my instructions for account of my firm of D. Mayer & Son, Vicksburg, of

September   3, 200 bales cotton, December and January delivery, at _____ $4\frac{60}{64}$
September   5, 300 bales cotton, December and January delivery, at _____ $5\frac{3}{128}$
September 12, 200 bales cotton, January and February delivery, at _____ $5\frac{4}{64}$
September 14, 200 bales cotton, January and February delivery, at _____ $4\frac{63}{64}$
September 15, 200 bales cotton, January and February delivery, at _____ $4\frac{61}{64}$
September 15, 200 bales cotton, February and March delivery, at _____ $4\frac{127}{128}$
September 15, 200 bales cotton, March and April delivery, at _____ $5\frac{2}{64}$
September 17, 200 bales cotton, April and May delivery, at _____ 5

and it is understood that these contracts be liquidated before the time specified for delivery in the contracts.

"Your commission for attending to the business is three-fourths per cent., including brokerage, and, whenever contracts are closed out, and you require a margin, my firm will readily provide same by remittance of bills of exchange. This same process will also have reference to the balance of your account lately rendered. . . . Yours truly,

"OSCAR E. MAYER."

After the return of Mayer to this state the appellants made like purchases of five hundred other bales of cotton for future delivery, of which Mayer & Son were duly advised, and of which they approved.

Under the rules of the Liverpool exchange, contracts for the sale and purchase of cotton for future delivery could be made only by and between its members and in their names; and in all the contracts for the cotton above noted, Lemonius & Co. were named as the purchasers.

Under another rule of the exchange, weekly settlements were required of any differences of price of the cotton from that obtaining at the time of the contract, so that, under the contracts made by Lemonius & Co., in which they appeared as purchasers, if the price of cotton had advanced, they would have received in cash from the seller, each week, the advance in price, and if cotton declined, they were required to make like payments to the seller. In the terminology of the exchange, these payments are called "margins." Either the seller or buyer may elect to make or demand delivery of the cotton agreed to be sold and bought, but the general and, it seems, practically uniform custom, is that final settlements are made by payment and receipt of the differences in price at the time for delivery from that prevailing at the payment of the last weekly "margins." These settlements are made by "closing out the contracts." Contracts of this character are called, in England as in the United States, "futures,"

and by their number and volume have become matters of common knowledge.

Under the contracts made by Lemonius & Co. for Mayer & Son, there were losses to the amount of $20,222, which were paid by Lemonius.& Co., and charged by them on their account against Mayer & Son, on which account the latter firm were also largely indebted on other dealings, and as to which other indebtedness there is no controversy.

Lemonius & Co. exhibited their bill in the chancery court of Issaquena county to subject to the payment of their demand certain real and personal property in that county, which they averred had been fraudulently disposed of by Mayer & Son. On final hearing, the complainants were granted relief except as to so much of their demand as arose out of the payment by them of the losses on the contracts for " futures" hereinbefore set forth, which losses the court below held could not be recovered, because they arose in a gaming venture or on contracts prohibited by the laws of this state. From this decree Lemonius & Co. appeal, and the single question for decision is whether complainants are entitled to recover for the payments made by them on losses under the future contracts.

Counsel for the respective parties have presented elaborate and instructive arguments touching the validity.of these contracts under the laws of England, where they were made and to be performed; and counsel for appellants also argue that, even if it be found that the contracts themselves were invalid under the English law, as being gaming agreements, yet, the contracts between Lemonius & Co. and Mayer & Son are collateral to the gambling contracts, and should be enforced, notwithstanding the invalidity of the principal contract under which the losses occurred. Without examining these questions, we shall consider the case upon the assumption that, in the courts of England, the complainants would be entitled to recover the controverted demand.

At the times when the contracts were made and the losses

were paid by the appellants, the act of March 7, 1882 (Laws of 1882, pp. 140 and 141), was in force in this state. That act is entitled "An act to prohibit the sale and purchase of 'futures' in the state of Mississippi," and is as follows:

"SECTION 1. *Be it enacted by the legislature of the state of Mississippi*, That it shall hereafter be unlawful for any person, by agent or otherwise, to deal in. contracts commonly called 'futures' in this state; and any person convicted of buying or selling, either by agent or otherwise, any future contracts, commonly called 'futures,' shall be fined not less than fifty and not over five hundred dollars.

" SEC. 2. *Be it further enacted*, That no money advanced for the purchase of futures, nor any agreement for the payment of any sum for such purchases, shall be enforced in any court in this state.

"SEC. 3. *Be it further enacted*, That this act take effect and be in force from and after its passage."

If the second section of this act stood alone, the right of a party to the condemned contract or of one who had advanced money to be used in the purchase of futures, to access to the courts of this state would unquestionably be denied, without regard to the place where such contract or advancement had been made, and without regard to the validity or invalidity of such contract by the law of the place. The true construction of this section is rendered somewhat obscure by its position in the act, and by the limitation as to place of the acts made unlawful by the first section and by the title of the act. The language employed in the second section is broad enough to contain, and, construed by itself alone, would contain, a prohibition of any remedy in the courts of this state to a party to a contract for "futures" or to one who had advanced money for the purchase of futures, whether such contract was made within or without this state. But the title of the act is " to prohibit the sale and purchase of futures in the state of Mississippi," and the first section makes it unlawful "to deal in contracts commonly called

futures in this state," and declares a punishment to be in-
flicted upon the guilty party. The question is whether the
second section is limited in its operation to the contracts
made unlawful by the first—viz.: to contracts made *in this
state.*

A primary rule of construction is that the legislature must
be assumed to have meant precisely what the words of the
law, as commonly understood, import; and this may be said
to be the fundamental and controlling rule of construction.
Endlich on Interpretation of Statutes, § 2. But since it
sometimes happens that a rigid adherence to this rule would
result in a meaning different from the legislative purpose,
there are other rules which must be kept in view in determin-
ing the construction and interpretation of the words of a
statute, where there may be a doubt whether a literal read-
ing will disclose the legislative purpose. Among the most
important of these are that courts should always consider
(1) the old law, (2) the mischief, (3) the remedy provided
by the act under consideration. Now, the old law was that
the contracts commonly called " futures " were legal con-
tracts, and that a party thereto might enforce them by resort
to the courts. The mischief was that these contracts were
in their nature speculative, and very generally were gambling
agreements, covered and protected by the rules and regula-
tions of the exchanges in which they were transacted, under
devices which rendered it impossible for the courts to dis-
cover their real character. That the evil had assumed gigantic
proportions is shown by the demand of a large portion of
the people of the country that national legislation shall reg-
ulate or suppress it, and by the fact that a bill has passed one
house of congress for that purpose. This, it is true, has oc-
curred since the passage of the act of 1882, but that the sup-
posed evil is the same at which the act of 1882 was aimed,
cannot be doubted.

The evil was the speculative dealings by means of these
contracts as usually made, degenerating generally into mere

gambling on the future price of the thing ostensibly bought or sold. We know, as a matter of general information, that transactions in "futures" are made very generally, if not exclusively, in the large cities, and that there are but few of these cities in which contracts of this character can be made under the rules and regulations of their exchanges, and that, without the protection of these exchanges, it would be impossible for the custom as it now obtains to exist, or to exist in any considerable extent in any form. We know also that, in this state, there was not, at the time of the passage of the act of 1882, and never had been, any large city having the commercial machinery necessary for the transaction of this business, and that, in fact, it was never supposed to be carried on to any considerable extent within the state. A few firms located in other states may have established agencies here to invite and expedite the making of such contracts, but they were insignificant in number or effect.

If such was the character of the evil intended to be cured, it is evident that a statute confined in its operations to the few contracts which might be made within the state, would fall far short of affording a sufficient remedy for its correction. We find nothing, therefore, thus far, which suggests that the natural and ordinary meaning of the words of the statute should be restrained. But beyond this, a consideration of other equally familiar rules of construction will strengthen the conclusion that the legislature meant by the second section of the act all that its words import. The first section of the act, by its terms, refers only to contracts made in this state; but this section is confined to a declaration of the illegality of the contracts, and to subjecting parties thereto to punishment, and its legal effect would have been precisely the same, whether the words " in this state" had been used or omitted, for the laws of this state cannot have any extraterritorial effect, and cannot therefore either invalidate a contract made without its limits or subject a party thereto to punishment. It is therefore manifest that the words "in this state" were

inserted in this section *ex industria.* By this section the legislature proceeded, as far as it had power, to declare the invalidity of contracts for futures, viz., of those made *in this state.*

The second section proceeded in a different direction, and declared that access to the courts of this state should be denied to parties to a contract for " futures," or to any one who had advanced money to be used in such contracts. It is to be noted that the limiting words, " in this state," found in the first section, are omitted from the second, which declares, in general words, " that no money advanced for the purchase of futures, nor any agreement for the payment of any sum for such purchases, shall be enforced in any court in this state." If the legislative purpose had been to confine the operation of the second section to contracts made or money advanced in this state, why the change of phraseology by dropping the limiting words of the first section, the use of which would have demonstrated its meaning in the second? While a mere change of phraseology is not of great significance, it may be of importance if the context or subject-matter suggests that it was deliberately done.

But, further than this, if the second section of the act be held to apply only to the contracts named in the first section —viz., contracts made in this state—the section becomes entirely or largely without any operation whatever—mere surplusage—for it is well settled that where an act is made illegal and criminal, no right of action can arise therefrom. *McWilliams* v. *Phillips*, 51 Miss., 196; *Cotten* v. *McKenzie*, 57 *Ib.*, 418. Though words of a statute will be treated as surplusage to uphold the manifest purpose of the legislature (*State* v. *Stinson*, 17 Me., 154), the general rule of construction is to so read the law as to give some effect to all its parts. Endlich on Interpretations, §§ 23, 265, 413 ; *Ellis* v. *Murray*, 28 Miss., 129.

These considerations lead us to the conclusion that by the second section of the act of 1882 the complainants were de-

nied access to the courts of this state to enforce their demand against Mayer & Son for the money advanced for the purchase of the "futures" in cotton.

The act of 1882 is not now in force in this state, having been repealed by the code of 1892; but by § 4 of that code it is continued in force as to all rights of action or defense existing under it while operative.

*The decree is affirmed.*

CAMPBELL, C. J., *dubitatur.*