T. H. BANFIELD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 93313, 98688, 99999. Promulgated September 27, 1940.

*Charles E. McCulloch, Esq.,* for the petitioner.
*John H. Pigg, Esq.,* for the respondent.

DISNEY: These proceedings, consolidated for hearing, involve income tax deficiencies for the years 1935, 1936, and 1937 of $1,648.18, $3,540.75, and $6,824.69, respectively. By reason of matters affirmatively pleaded in an amended answer in Docket No. 93313, the respondent claims an increased deficiency for 1935 of $4,552.70.

The questions in issue are:

(1) Whether the petitioner is taxable on the entire net income of the partnership of Collins & Banfield for the years 1935, 1936, and 1937, as contended by the respondent, or upon only one-half of the net income, as contended by the petitioner.

(2) Whether in computing the net income of the partnership for 1935 there should be deducted from the gross income the full amount of the loss of $12,480.19 sustained from trading in grain futures on grain exchanges, or only $2,000 of that loss under the provisions of section 117 (d) of the Revenue Act of 1934.

(3) Whether the petitioner is entitled to deduct from his gross income of 1936 $1,321.53 taxes paid by him in 1936 upon real estate in Multnomah County, Oregon, purchased March 4, 1935.

(4) Whether the petitioner is entitled to a bad debt deduction of $6,546.96 in the year 1937 on account of loans made to his uncle in prior years.

The issues will be considered separately in their numerical order.

### Issue 1.

FINDINGS OF FACT.—The petitioner is a resident of Portland, Oregon. His income tax returns for the calendar years 1935, 1936, and 1937 were made to the collector at Portland.

During the years 1935, 1936, and 1937 the petitioner was a member of a partnership, Collins & Banfield (hereinafter sometimes referred to as the partnership), which was formed under a written agreement

(hereinafter referred to as the partnership agreement), with H. W. Collins on February 23, 1929, reading as follows:

### JOINT ADVENTURE CONTRACT

THIS AGREEMENT made this 23rd day of February, 1929, by and between H. W. COLLINS of Pendleton, Oregon, and T. H. BANFIELD, of Portland, Oregon, WITNESSETH:

WHEREAS, H. W. Collins has negotiated a contract with C. C. Perringer and others, for the purchase of the Perringer lands, leases, outfit and crops in Umatilla County, and the taking of a lease for twenty years upon approximately nine hundred sixty (960) acres of the land retained by the Perringers, and

WHEREAS said contract has been made by the said H. W. Collins for the benefit of the parties hereto and it is desired to reduce in writing the terms of the agreement between the parties thereto.

THEREFORE, the parties in consideration of the mutual covenants, hereby agree with each other as follows:

### I.

T. H. Banfield has advanced Five Thousand Dollars ($5000) to apply upon said purchase, and is to advance Ninety Five Thousand Dollars ($95,000) more to make the original payment under said contract, and agrees to advance such sums hereafter as may be necessary to continue the operations conducted under this agreement.

### II.

All sums advanced by T. H. Banfield shall bear interest at 6½% per annum from the time the same are advanced by him and shall be repaid to him from any moneys received from, or on account of the property embraced in the joint adventure, prior to any division of the profits.

### III.

All leases, crops, lands and outfit acquired under said Perringer contract, or hereafter acquired in the farming operations conducted by the partners, shall belong equally to the parties hereto, subject only to the repayment of the advances made by Banfield, and the parties are to share equally in all losses or profits, on account of said operations.

### IV.

Collins agrees to devote such of his time and attention as is necessary toward the management of the property so acquired, in order to keep the same in a productive state; and agrees that he will keep accurate records and books of account showing all receipts and disbursements on account of said property, which books of account shall be open to inspection by Banfield at any and all reasonable times, without compensation to Collins, except his interest in the profits.

### V.

It is agreed that Collins may sell and dispose of wheat and other crops in the usual and ordinary course of the business and pay the expenses of conducting the same, but Collins agrees that he will not sell or dispose of any of the land or leases, nor make any sale outside of the usual and ordinary course of business without the consent of Banfield.

## VI.

Deed covering the lands purchased is to be deposited in escrow in the Inland Empire Bank of Pendleton. The name of the grantee therein is left in blank and if said lands are not transferred prior to the time said escrow is completed, then the name of the grantee in such deed shall be filled in as H. W. Collins and T. H. Banfield, unless the parties then otherwise agree.

## VII.

Leases and other property held in the name of Collins, and involved in the Perringer deal, or hereafter acquired in connection with the operations conducted by the partners, shall be joint property, whether or not the same are taken in the name of Collins alone or otherwise.

## VIII.

Books, records and bank accounts shall be kept in the name of Collins & Banfield, and the funds and property of the joint adventure shall not be mixed or commingled with other funds or property of the parties hereto.

On July 7, 1934, the petitioner and H. W. Collins entered into a written agreement entitled "Supplemental Joint Adventure Agreement" (hereinafter referred to as the supplemental agreement of July 7, 1934), as follows:

### SUPPLEMENTAL JOINT ADVENTURE AGREEMENT

THIS SUPPLEMENTAL AGREEMENT made and entered into this 7th day of July, 1934, by and between H. W. COLLINS, of Portland, Oregon, and T. H. BANFIELD, of Portland, Oregon, WITNESSETH:

WHEREAS, said parties entered into a joint adventure contract and agreement on the 23rd day of February, 1929, and

WHEREAS, said agreement is not in all respects clear as regards the status of certain funds advanced, and

WHEREAS, it is desired that the intent of the aforesaid agreement may be clarified,

THEREFORE, said parties hereby mutually agree as follows:

### I.

That of the One Hundred Thousand Dollars ($100,000.00) referred to in Section I of the aforesaid agreement to be advanced and subsequently advanced by T. H. Banfield, the sum of Fifty Thousand Dollars ($50,000.00) was advanced to H. W. Collins by T. H. Banfield and then advanced by H. W. Collins to the joint adventure and constitutes the personal obligation of H. W. Collins to T. H. Banfield, both as to principal and as to interest at the rate of 6½% per annum to be paid thereon.

### II.

It was at all times the intent that the amount of One Hundred Thousand Dollars ($100,000.00) should be contributed one-half by each of the said parties and that such further advances as were required and as have been made by T. H. Banfield are the obligations of the joint adventure and are to bear interest and to be repaid in the manner specified in said agreement of Febru-

ary 23, 1929, and that it is not the intent of this SUPPLEMENTAL AGREEMENT to alter or to modify the terms of the original agreement in any manner whatsoever except as next above stated.

### III.

The intent of the JOINT ADVENTURE CONTRACT and this SUPPLEMENTAL JOINT ADVENTURE AGREEMENT is that of the One Hundred Thousand Dollars ($100,000.00) first supplied by T. H. Banfield, Fifty Thousand Dollars ($50,000.00) was and is the pro rata contribution of T. H. Banfield to the capital of the joint adventure, and Fifty Thousand Dollars ($50,000.00) was and is a loan by T. H. Banfield to H. W. Collins, the proceeds to be used as the pro rata contribution of H. W. Collins to the capital of the joint adventure. It is also the intent of the joint adventure contract and this supplemental joint adventure contract that T. H. Banfield shall have a first claim against and lien upon the lands, leases, equipment and other assets of said joint adventure for the reimbursement of said T. H. Banfield for all sums of money heretofore advanced or which may hereafter be advanced by said T. H. Banfield, in connection with the original purchase of the lands of said joint adventure, together with interest thereon, and for operating expenses of said joint adventure.

Since February 23, 1929, and at all times material to these proceedings, the affairs of the partnership have been conducted in accordance with the terms of the partnership agreement of February 23, 1929, and the supplemental agreement of July 7, 1934.

On or about February 28, 1929, the petitioner advanced the amount of $100,000, referred to in paragraph I of the partnership agreement of February 23, 1929, and paragraphs I, II, and III of the supplemental agreement of July 7, 1934, which amount was contributed to and invested in the partnership business as provided in said agreements. In addition, petitioner advanced to the partnership for the purpose of continuing the partnership operations further sums to May 10, 1934, totaling $150,491.30. Of these advances the amount of $19,591.05 was repaid to petitioner prior to January 1, 1935, as follows: March 2, 1934, $15,000, and May 6, 1934, $4,591.05. This left a credit balance of $130,900.25 in the ledger account entitled "T. H. Banfield—Advances" as at January 1, 1935. No advances were made by petitioner to the partnership between January 1, 1935, and December 31, 1937. On September 8, 1937, petitioner was repaid $15,000 of his advances, leaving a credit balance of $115,900.25 in the ledger account entitled "T. H. Banfield—Advances" as at December 31, 1937.

There was no actual distribution of cash or other property by the partnership during any of the years 1935, 1936, and 1937 on account of the partners' respective distributive shares of the partnership net income.

The partnership's books were kept on the accrual and calendar year bases. Petitioner's books were kept and his returns for the years 1935, 1936, and 1937 were filed on the cash basis.

Interest was credited to the petitioner's account on the partnership books for the years 1935, 1936, and 1937 in the amounts of $20,944.75, $22,302.60, and $23,508.52, respectively.

The interest was computed at 6½ percent per annum upon the full amount of the advances made by the petitioner to the partnership, including the $100,000 referred to above, and upon the accrued interest at the beginning of each calendar year. Thus, the interest of $20,944.75 for 1935 represents:

(1) Interest on capital ($100,000) _____ $6,500.00
(2) Interest on advances to 1/1/35 ($130,900.25) _____ 8,512.08
(3) Interest on interest due or payable ($91,271.89) _____ 5,932.67

Total_____ 20,944.75

Without the deduction of the above stated amounts of interest the partnership had a net loss for 1935 of $69.08, a net gain for 1936 of $11,105.14, and a net gain for 1937 of $15,294.16.

OPINION.—The petitioner contends that he is liable to income tax for each of the years 1935, 1936, and 1937 upon only one-half of the net income of the partnership; that, reading paragraphs II and III of the partnership agreement of February 23, 1929, together, it is apparent that it was the intention of the parties that he, the petitioner, was to get only one-half of the partnership net income, computed without deduction from the gross income of the interest which was credited to his account with the partnership.

The respondent, on the other hand, contends that the net income of the partnership, up to the amount of the interest payable to the petitioner upon his investment, belonged entirely to the petitioner, and is therefore taxable to him.

The parties are in agreement that in computing the partnership net income the amount of the interest credited to the petitioner's account on the partnership books should not be taken as a deduction.

The wording of paragraph II of the partnership agreement of February 23, 1929, is:

All sums advanced by T. H. Banfield shall bear interest at 6½% per annum from the time the same are advanced by him and shall be repaid to him from any moneys received from, or on account of the property embraced in the joint adventure, prior to any division of the profits.

We think it quite apparent from this language that the parties did not contemplate that there would be any division of profits until after the interest on petitioner's investment had been set aside. The profits which were to be shared equally by the partners were those in excess of the interest credited to petitioner's account. During the calendar years 1935, 1936, and 1937 there were no profits of the partnership in excess of the interest credited to petitioner. Therefore, the profits of the partnership, if the partnership had net income in those years, belonged in its entirety to the petitioner.

It has been held in many cases that the profits of a partnership which are credited or paid out as interest on partners' capital contributions, or salaries paid to partners, constitute distributable income of the partnership to the person entitled to the interest or the salary. See *Parker* v. *Commissioner of Corporations and Taxation*, 255 Mass. 546; 152 N. E. 34; *Estate of S. U. Tilton*, 8 B. T. A. 914; *John A. L. Blake*, 9 B. T. A. 651, 655; *Ella Daly King, Executrix*, 10 B. T. A. 698; *Charles J. Billwiller*, 11 B. T. A. 841; *W. W. Martin*, 12 B. T. A. 1385; *Augustine M. Lloyd*, 15 B. T. A. 82; *Guaranty Trust Co. of New York, Executor*, 34 B. T. A. 384, 391.

In none of the taxable years before us did the profits of the partnership exceed the interest on petitioner's advances to it, exclusive of one-half of the $100,000 originally advanced by the petitioner in 1929, which under the supplemental agreement of July 7, 1934, was said to be a loan to Collins and an advancement by him to the partnership. Thus, all of the profits of the partnership for the years before us are taxable to the petitioner as amounts which he was entitled to receive under the partnership agreements as interest on the undistributed amounts which he himself advanced to the partnership.

We sustain the respondent's contention that the petitioner is liable to income tax upon the entire net income of the partnership for the years 1935, 1936, and 1937.

*Issue 2.*

FINDINGS OF FACT.—In its income tax return for 1935 the partnership of which petitioner was a member deducted from gross income $12,480.19, in which amount the partnership had sustained in 1935 a loss as a result of its dealings in grain futures on grain exchanges, through marginal transactions handled by brokers. The facts are all stipulated. A written stipulation filed at the hearing recites as follows:

9. During the year 1935 the partnership sustained a loss of $12,480.19, as a result of its dealings in grain futures on grain exchanges. These transactions were handled through brokers. They were marginal transactions. In arriving at the partnership book loss of $21,013.83 for the year 1935, as set forth in paragraph 8, above, the loss of $12,480.19, so sustained by the partnership from grain futures transactions, was deducted from the partnership gross income for that year.

At the hearing it was further stipulated "that no deliveries of wheat were taken under these marginal contracts, and that they were closed out before the end of the year 1935"; also, that the partnership "neither accepted deliveries nor made deliveries nor consummated those purchases or sales, whatever they were"; also that the partnership "had no inventories either at the beginning or at the

close of the year * * * with respect to these marginal transactions." In addition to the facts stipulated, the petition alleges, and the answer admits, that the petitioner during 1935 was engaged with one H. W. Collins in operating a wheat farm, in the operation of which petitioner contributed capital.

OPINION.—In the determination of the deficiency the respondent did not disallow any part of the $12,480.19 loss deducted from the partnership gross income, and no issue in that respect was set up in the petition, the only error alleged by the petitioner as to the year 1935 being the increase of petitioner's share of partnership profits from $2,724.41 to $5,448.82, on the theory that the petitioner should have reported all instead of one-half of the partnership profits. Petitioner's allegations in that regard were denied in the original answer, but in an amended answer the respondent alleged, in effect, that he erred in not increasing the net income as reported by petitioner by disallowing all of the loss of $12,480.19, except $2,000, alleging that the loss of $12,480.19 was sustained by the partnership from the sale or exchange of capital assets; and therefore he alleges a deficiency of $4,552.70, instead of the deficiency of $1,648.18 originally asserted in the deficiency notice.

Under such circumstances, the respondent has the burden of proof. His contention, in short, is that the deduction of the $12,480.19 loss sustained by the partnership as a result of its dealings in grain futures in 1935 is limited to $2,000 under section 117 of the Revenue Act of 1934. In our opinion the only evidence before us, the facts above recited, fails to sustain that burden. In substance, the facts shown are that the partnership, engaged in wheat farming, sustained a loss from dealings in grain futures on grain exchanges, which dealings were marginal transactions through brokers, no deliveries of wheat being taken and there being no inventories with respect to the marginal transactions, which were closed out before the end of the year. These facts are insufficient to indicate whether the transactions were hedging transactions, giving right to deduction of the entire $12,480.19 as an ordinary loss, or were transactions in the nature of sales or exchanges of capital assets, giving right to deduction of only $2,000, under the facts herein. *Ben Grote*, 41 B. T. A. 247; *Farmers & Ginners Cotton Oil Co.*, 41 B. T. A. 1083.

Although section 117 (e) of the Revenue Act of 1934 provides that gains or losses from short sales of property shall be considered as gains or losses from sales or exchanges of capital assets, the facts herein do not indicate whether the transactions were short sales. We hold that the respondent has not shown that he erred in the allowance of the entire $12,480.19 as loss in the determination of the original deficiency herein.

*Issue 3.*

FINDINGS OF FACT.—On March 4, 1935, the petitioner acquired by purchase certain real estate situate in Multnomah County, Oregon, from the Kansas Investment Co., without any agreement with the grantor respecting the payment of taxes assessed against the property prior to the acquisition or as to the payment of taxes thereon for 1935 which would become due and payable in 1936. During the year 1936 the petitioner paid taxes to the County of Multnomah on the property in the amount of $1,321.53, which taxes were levied by the County Court for Multnomah County during its December (1935) term for the year 1935.

In his return for 1936 the petitioner claimed a deduction of the amount of $1,321.53 as taxes paid by him during that year. In his determination of the deficiency involved for 1936 the respondent disallowed the deduction so claimed by the petitioner, stating in his deficiency notice:

In your return you deducted taxes paid on real property acquired subsequent to March 1, 1935, in the amount of $1,321.53. It is held that since the property in question was acquired subsequent to March 1, 1935, the taxes paid by you constitute an addition to the cost of the property and that they are not deductible, therefore, in the computation of your taxable income for the year 1936.

OPINION.—Section 69–722, Oregon Code 1930, in effect when the petitioner acquired the property, provided in part:

* * * The taxes assessed upon real property shall be a lien thereon from and including the first day of March in the year in which they are levied until the same are paid, *but as between a grantor and a grantee the procedure in regard to the lien shall be as set forth in section 69–710, Oregon Code.* * * *. [Italics supplied.]

Section 69–710 of the Oregon Code for 1930, likewise in effect at the time of sale of the property here involved, provides:

As between the grantor and grantee of any land, when there is no express agreement as to which shall pay the taxes that may be assessed thereon before the conveyance, if such land is conveyed at the time or prior to the date of the warrant authorizing the collection of such taxes then the grantee shall pay the same, but if paid after the date the grantor shall pay them.

The respondent contends that the petitioner, having purchased the property after the incidence of the tax lien on March 1, under the first clause of section 69–722, Oregon Code 1930, *supra*, paid the taxes of his vendor, and is entitled to no deduction therefor. He relies upon *Gatens Investment Co.*, 36 B. T. A. 309, where we held to that effect. The petitioner, on the other hand, emphasizes section 69–710, above, and that portion of section 69–722 reading "but as between a grantor and a grantee the procedure in regard to the lien shall be as set forth in section 69–710, Oregon Code." He therefore urges that,

title having passed "prior to the date of the warrant authorizing the collection of such taxes", and "as between the grantor and grantee" there having been "no express agreement as to which shall pay the taxes that may be assessed", the petitioner-grantee paid his own taxes and is entitled to deduction thereof. He cites *Commissioner* v. *Plestcheeff*, 100 Fed. (2d) 62, affirming 35 B. T. A. 508, and contends that *Gatens Investment Co.*, *supra*, was erroneously decided.

That title passed before the date of the warrant authorizing collection of taxes can not be denied. It passed on March 4, 1935. Under the statutes of Oregon the assessor makes a return to the county clerk on an assessment roll of all property owned by taxpayers on March 1, a board of equalization meets on the last Monday in August to examine and correct the roll, the state tax commission meets in October to equalize assessments, the county court meets in December to estimate the amount of money to be raised by taxation and at that term of court to make the tax levy, within 15 days of which the county clerk delivers a copy of the assessment roll, and a warrant commanding collection of the tax, to the tax collector. The taxes become due and payable during the succeeding calendar year. What is the date governing this question? In *Gatens Investment Co.*, *supra*, a case from Oregon, we followed Oregon decisions and held it to be the date of incidence of tax lien, March 1; in *Commissioner* v. *Plestcheeff*, *supra*, involving realty in the State of Washington, the court construed the statute of that state as to date of tax lien as between grantor and grantee, and held that under such statute taxes did not, as between grantor and grantee, become a lien until February following March 1 upon which in general they became a lien. Does that decision require the conclusion here that the petitioner is entitled to deduction of taxes paid? We think not, for we find a difference between the statutes of Oregon and Washington in that regard, and find that the Supreme Court of Oregon has, as we said in *Gatens Investment Co.*, *supra*, passed upon the question in Oregon and has held the determinative date to be March 1.

We first compare the two statutes: The Washington statute, construed in the *Plestcheeff* case, provides, as does the above statute of Oregon, that taxes assessed upon real property "shall be a lien thereon from and including the first day of March in the year in which they are levied until the same are paid." The Washington statute then continues: "but as between a grantor and grantee such *lien shall not attach* until the first Monday in February of the succeeding year." (Italics supplied.) The Oregon statute, however, continues as follows: "but as between a grantor and a grantee the procedure in regard to the lien shall be as set forth in section 69–710, Oregon Code." It thus appears that the Washington law definitely,

as between grantor and grantee, sets the first Monday in February of the succeeding year as the date before which the lien shall *not* attach, while the law of Oregon not only sets no such date and does not forbid the lien to attach earlier, but merely refers to lien procedure in another section, 69–710, which likewise fails to name, as between grantor and grantee, any date of tax lien attachment different from March 1, the date named in section 69–722, saying only that as between grantor and grantee the grantee shall pay if the conveyance is prior to date of tax warrant, while if deed is thereafter, the grantor shall pay. This is obviously different from setting a *tax lien date* between grantor and grantee, distinct from and much later than the ordinary tax lien date, as does the Washington statute. We find no tax lien date set in Oregon, other than March 1. The Oregon statute in effect provides not a tax lien date, but a day which shall determine controversies between grantors and grantees who have not settled by contract the question as to who shall pay taxes. We think the Oregon statute can be given no such effect as was given in the *Plestcheeff* case to the very definite Washington statute fixing February 1 as date of tax lien. Most states have statutes more or less similar to that of Oregon, and we think the intent thereof is limited to effect as between grantor and grantee and not to affect the lien of the sovereign for taxes. At any rate, the Supreme Court of Oregon has so held, in *Ferguson* v. *Kaboth*, 43 Or. 414; 73 Pac. 200, involving real property and says of section 69–710, the grantor-grantee provision: "This section, however, was simply designed to define the respective rights of a grantee and grantor of land upon which taxes had been assessed, as between themselves." The case has never been overruled and therefore appears to control interpretation of the Oregon statute, rather than Washington cases based upon the Washington statute, above seen to be different.

The petitioner, however, urges that the Oregon statute was taken from Washington, and that the *Plestcheeff* case interpreting the Washington statute is fully applicable here. He cites *Haskins* v. *Dwight*, 69 Or. 558. That case, however, though it states that the tax statute being interpreted is patterned after the laws of the State of Washington upon the same subject, refers only to the general statute that all taxes on real property impose a lien thereon, referring to L. O. L. 3864, not the same statute as here involved, which is not stated to be derived from Washington. At the date of that decision in 1915 the Oregon statute contained, under the law of 1907, only the provision that, as between grantor and grantee, grantee should pay if conveyance was prior to date of tax warrant, no reference being made to date of lien. In other words, the lien was not

affected. Therefore, *Haskins* v. *Dwight, supra,* has no effect upon, and Washington is not shown to be the source of, section 69–722 passed in 1917, referring to "the procedure in regard to the lien", being between grantor and grantee, "as set forth in section 69–710, Oregon Code." We find no reason to base section 69–722 upon Washington statutes. Moreover, *Port of Seattle* v. *Yesler Estate,* 83 Wash. 166; 145 Pac. 209, the earliest Washington case cited in the *Plestcheeff* case upon the question whether the grantor-grantee provision is effective only between those parties was decided in 1915 some twelve years after the decision of the Oregon court in 1903 in *Ferguson* v. *Kaboth, supra;* so that the later Washington decisions can be given no effect as against the *Kaboth* case.

Petitioner contends that the *Gatens Investment Co.* case, *supra,* was erroneously based upon personal liability of the grantor, and points out that *Covey* v. *Hurlburt,* 207 Pac. 166, there cited, involved personalty. In the latter case the court was considering section 4268 Or. L., which specifically covers both personal property and real property, in providing the manner of assessment, yet the Oregon court said: "Section 4268 Or. L. has the effect to make the person who is the owner of the property on March 1 of any year liable to pay the taxes thereon." We find in section 4268 the further justification for the general language used in *Covey* v. *Hurlburt, supra:* "Except as otherwise provided by law, every person shall be assessed in the county where he resides at the hour of one o'clock A. M., on March 1st of the year when the assessment shall be made for all real and personal property owned by him within such county * * *." Obviously, then, assessment is against the person who is owner of the property on March 1. The court did not distinguish between real and personal property, and considered the date of assessment or tax lien as determinative of liability. Such holding of the Oregon court is consonant with many decisions which in effect hold that taxes are those of the owner of property on a designated date, ordinarily called date of tax incidence, and that a later purchaser, in paying them, pays as a part of his investment. Whether called personal or not, the liability for tax is upon the then owner, and not his successor in title. We note among such cases *Lifson* v. *Commissioner,* 98 Fed. (2d) 508; certiorari denied, 306 U. S. 618. It involved real property in Minnesota, and the court held that the lien of the state for taxes attached upon May 1, 1933, and that one who purchased thereafter was not, under section 23 (c) of the Revenue Act of 1934, entitled to deduction of the 1933 taxes paid in 1934. That the taxes were not yet ascertained in amount and were not payable until January 1934 was held not to govern. The taxes were not a personal liability of the owner on May 1, but the court holds that under section 23 (c) of the revenue act they

"accrue" when they become a charge against and a lien upon the land. It is pointed out in a footnote that after providing the lien effective from May 1, the Minnesota statute also provides: "but, as between grantor and grantee, such lien shall not attach until the first Monday of January of the year next thereafter."

We conclude that under Oregon statutes and decisions the owner of real property is assessed therewith on March 1, that the lien attaching for taxes on that date is not removed or changed to any later date because of conveyance thereafter, and that the purchaser in paying taxes assessed and accrued as a lien on March 1 merely pays cost of acquisition of the property and is not entitled to deduction under section 23 (c) of the Revenue Act of 1934.

## Issue 4.

FINDINGS OF FACT.—In 1926 the corporation of Parker & Banfield, of which the petitioner was one of the principal stockholders, loaned to M. C. Banfield, petitioner's uncle, $3,800, taking his personal note therefor, together with collateral of 135 shares of stock in the Realty Associates of Portland. M. C. Banfield desired the loan in order to clean up an obligation he owed to a third party. On the dissolution of Parker & Banfield as of December 21, 1929, the petitioner acquired the note at its face value and also received the shares of stock put up as collateral.

During the years 1930 to 1935, inclusive, the petitioner loaned to M. C. Banfield a total of $2,746.96, represented in part by notes and in part by book accounts. These sums were used by M. C. Banfield for the payment of taxes and for extensive improvements on an apartment house operated by him. No part of the above described loans constituted contributions for the personal support of M. C. Banfield or his family.

M. C. Banfield was a substantial business man in Portland for many years and during the period here involved was manager of the Realty Associates of Portland and the owner and operator of the apartment house referred to. Through the period from 1930 to 1937 the petitioner believed that his loans to M. C. Banfield were still secured and would be paid in full.

M. C. Banfield died on November 29, 1936, survived by his widow, of the age of 78 or 79 years, and four daughters. At the date of his death Banfield owned only the 135 shares of stock in Realty Associates of Portland and the apartment house above referred to. The income from the apartment house was not sufficient to pay interest, taxes, and other charges. After canvassing the situation, M. C. Banfield's heirs quitclaimed the property to the mortgagee in the early part of 1937 in consideration of a release from the mortgage

debt. There was no estate to be administered and the estate was never probated.

The 135 shares of Realty Associates of Portland held by the petitioner as collateral for his loans, although belonging to him, had never been transferred to his name. They were transferred to him in 1937. He then first learned the situation with regard to the company. It had a large bonded indebtedness, with practically no assets except its equity in many parcels of real estate. The petitioner found the stock to be worthless, although the corporation was still in existence. The petitioner ascertained his claim against the estate of M. C. Banfield to be worthless in 1937. At the end of 1937 he charged off as a bad debt the amount of $6,546.96 owed to him by the estate of his uncle and claimed the same as a deduction from his gross income in his income tax return. The deduction was disallowed by the respondent.

OPINION.—The reason for the disallowance of the claimed bad debt deduction is not stated in the respondent's deficiency notice. At the hearing of these proceedings counsel for the respondent contended that the petitioner should have known prior to 1937 that the debt was worthless. The evidence shows, however, that it was not until 1937 that the petitioner ascertained the debt to be uncollectible. He believed that his uncle was fairly prosperous and that if the debt could not be collected from his estate it, nevertheless, could be collected at least in part from the collateral which he held against the debt. It was not until 1937 that he learned the true condition of affairs. In good faith he ascertained the debt to be worthless in 1937. The respondent admits the charge-off of the bad debt in the amount of $6,546.96. The amount is a legal deduction from gross income.

Reviewed by the Board.

*Decisions will be entered under Rule 50.*

TURNER dissents on the second point.

---

SMITH, dissenting: 1. During the year 1935 the partnership of Collins & Banfield sustained a loss of $12,480.19 from trading in grain futures on grain exchanges. In the determination of the deficiency for 1935 the respondent allowed the deduction of the loss in computing the net income of the partnership. By an amendment to his answer the respondent alleges that the loss was from the sale or exchange of capital assets during that year and that he erred in allowing a loss in excess of $2,000, under section 117 (e) of the Revenue Act of 1934.

No testimony was offered by the petitioner or by the respondent upon this issue. The parties entered into a stipulation of facts, which is incorporated in the majority report. At the hearing of these proceedings counsel for the petitioner stated:

* * * There was another question involving whether certain wheat transactions, margin transactions in wheat, which involved a loss of some $12,000 in the year 1935 were ordinary losses deductible in full, or whether they were losses subject to the capital limitation provisions of the statute. The Commissioner disallowed the loss in full and applied the $2,000 limitation. After some careful study of the facts, we shall not put on testimony with respect to that issue, although it is not covered in the stipulation, and I take it the presumption of the correctness of the Commissioner's determination will therefore apply to that particular item.

Counsel for the respondent then stated that counsel for the petitioner was in error in assuming that there was any presumption of correctness in the Commissioner's determination, since under the statute the burden of proof upon the issue was upon the respondent.

Thereafter, counsel for the petitioner and the respondent entered into supplemental stipulations which are incorporated in the majority report.

In its opinion the Board states that "the facts herein do not indicate whether the transactions were short sales."

In his brief counsel for the petitioner does not contend that the losses of $12,480.19 were not from "short sales of property" within the meaning of section 117 (e) of the Revenue Act of 1934. His only contention is that the respondent has not shown that they were not losses from hedging transactions, which are deductible from gross income in accordance with the Board's opinion in *Ben Grote*, 41 B. T. A. 247.

I think it clear from the record that both counsel for the petitioner and counsel for the respondent considered the phrase "dealings in grain futures on grain exchanges" as synonymous with "short sales of property" within the meaning of section 117 (e) of the applicable statute.

The phrase "dealings in grain futures on grain exchanges" has a well understood meaning. If a man buys wheat for future delivery on a grain exchange he is not, of course, entering into a short transaction. The buyer is not regarded as dealing in grain futures. He has merely purchased wheat to be delivered in the future and if he does not sell his contract prior to the date of the expiration of the contract the wheat is delivered to him pursuant to the terms thereof.

Where a man has a loss upon dealings in grain futures he sustains a loss from a short sale, as the term is generally understood.

In *Ben Grote, supra*, the Board held in its syllabus as follows:

The purchases and sales of wheat futures by a wheat farmer, made entirely for protection against price fluctuations, *held*, related to his business of production and sale of wheat, and losses sustained in such transactions, *held*, not capital losses subject to the deduction limitations of section 117, Revenue Act of 1934.

In our findings of fact we referred to these purchases and sales of wheat futures as "short sales."

In *Anderson v. State*, 2 Ga. App. 1; 58 S. E. 401, 410, it was held that the transaction termed "futures" is this:

One person says that I will sell you cotton at a certain time in the future for a certain price. You agree to pay that price, knowing that the person you deal with has no cotton to deliver at the time, but with the understanding that when the time arrives for delivery you are to pay him the difference between the market value of that cotton and the price you agreed to pay if cotton declines, and if cotton advances he is to pay you the difference between what you promised to give and the advance in market price.

To the same effect is *Hentz & Co.* v. *Booz*, 8 Ga. App. 577; 70 S. E. 108, 110. Cf. *Plank* v. *Jackson*, 128 Ind. 424; 26 N. E. 568, 569; *Lemonius* v. *Mayer*, 71 Miss. 514; 14 So. 33, 34.

The petitioner's reliance upon *Ben Grote, supra* (see also *Farmers & Ginners Cotton Oil Co.*, 41 B. T. A. 1083), is not well based. There is not a scintilla of evidence that the dealings in grain futures by the partnership of Collins & Banfield were in the nature of hedging transactions.

I think it was clearly the intention of Congress by section 117 (e) of the Revenue Act of 1934 to disallow the deduction of more than $2,000 from short sales of property. Nowhere in the taxing statute or in the Commissioner's regulations is it provided that losses from short sales of property may be allowed in a greater amount than $2,000, even though those transactions are hedging transactions. It is true that in G. C. M. 18658, Cumulative Bulletin XVI-2, p. 77, the respondent held in a particular case that where a taxpayer was engaged in carrying on operations in commodities dealt in on organized exchanges he was entitled to inventory goods on hand at market price and hence entitled to deduct losses sustained on short transactions in certain circumstances. There is no evidence, however, that such "certain circumstances" are present in this case.

Furthermore, it should be observed that rulings reported in the Internal Revenue Bulletin are declared in each bulletin to be "for the information of taxpayers and their counsel as showing the trend of official opinion in the administration of the Bureau of Internal Revenue; the rulings other than Treasury Decisions have none of the force or effect of Treasury Decisions and do not commit the Department to any interpretation of the law which has not been formally approved and promulgated by the Secretary of the Treasury."

Under the internal revenue acts the Commissioner, with the approval of the Secretary, is authorized to promulgate regulations for the administration of the acts. Those regulations are entitled to great weight. But the rulings of the Commissioner in particular cases are not regulations of the Commissioner. This was so held by the Supreme Court in *Helvering* v. *New York Trust Co.*, 292 U. S. 455. In that case the Supreme Court said:

\* \* \* The rulings, I. T. 1379, 1660, and 1889, cited by the Commissioner were made before the passage of the 1924 act, but they "have none of the force or effect of Treasury Decisions and do not commit the Department to any interpretation of the law." See cautionary notice published in the bulletins containing these rulings. \* \* \*

In my opinion it was not incumbent upon the respondent to negative the possibility that the losses on the short sale transactions here involved were losses from hedging transactions. The stipulated facts bring the case squarely within section 117 (e) (1) of the Revenue Act of 1934. The partnership is entitled to deduct only $2,000 of the $12,480.19 losses sustained upon the short transactions here involved.

2. On March 4, 1935, the petitioner purchased certain real estate situated in Multnomah County, Oregon, without any agreement with the grantor respecting the taxes assessed against the property prior to such acquisition or as to the payment of taxes thereon for 1935 which would become due and payable in 1936. Section 69–710 of the Oregon Code for 1930 provides:

As between the grantor and grantee of any land, when there is no express agreement as to which shall pay the taxes that may be assessed thereon before the conveyance, if such land is conveyed at the time or prior to the date of the warrant authorizing the collection of such taxes then the grantee shall pay the same, but if paid after the date the grantor shall pay them.

The taxes upon this parcel of property which became due and payable in 1936 were paid by the petitioner in that year in the amount of $1,321.53. The respondent has disallowed the deduction from petitioner's gross income of the taxes paid upon the ground that the taxes constituted a part of the cost of the property and are not "taxes paid" within the meaning of the statute. I think that this ruling is clearly wrong.

If the petitioner had made his income tax returns for 1935 and 1936 upon the accrual basis the petitioner would be entitled to the deduction of the taxes here involved; for the taxes were not levied until after the petitioner had purchased the property and taxes do not accrue "until the events by which that liability is fixed have occurred." *Commissioner* v. *Cudahy Family Co.* (C. C. A., 7th Cir.), 102 Fed (2d) 930, and authorities cited therein. Since the petitioner made his returns on the cash basis, the taxes are a legal deduction from the gross income of 1936, as the petitioner contends.

In *Commissioner* v. *Coward* (C. C. A., 3d Cir.), 110 Fed. (2d) 725, a taxpayer who purchased a parcel of real estate in New Jersey on October 16, 1933, and a second parcel on January 8, 1934, was held entitled to deduct on the cash basis all of the taxes paid by her in 1934 on the first piece of property and all but $\%_{365}$ of the taxes on the second piece of property. The taxes in question were assessed as of October 1, 1933, and would have become a lien upon the property on December 6, 1933, if not paid in 1934 when they became due. In that case, as here, the Commissioner contended that the taxes which had accrued against the property prior to the date of purchase might not be deducted from gross income when paid by the purchaser, upon the ground that they constituted a part of the cost of the property. This contention was rejected by the court. I think that the reasoning of the court in that case is sound.

It is furthermore to be observed that under section 69–710 of the Oregon Code the petitioner was liable for the payment of the taxes which became due in 1936. If the taxes had been paid by the grantor he would have had a valid claim against the petitioner for the recovery of the taxes. In this situation it seems to me that it is immaterial that a lien for the payment of the taxes later to be levied attached on March 1, 1935.

The interpretation placed by the Board upon a transaction of this sort is contrary to commercial practice. Ordinarily the cost of real estate is what a man pays the seller therefor. If he contracts with the seller to pay taxes that are owed by him the amount of such taxes becomes a part of the cost of the property. But that is not the situation here. The seller here did not know at the date of sale the amount of the taxes which would be assessed on his property for collection in 1936. The petitioner had to pay them and he did pay them. I dissent from the conclusion that the taxes paid by the petitioner in 1936 are not a legal deduction from his gross income.

HILL agrees with this dissent.